**Opinion filed December 13, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00098-CR

_____

## TIMOTHY PHILIP MORENO, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 17425B**

### M E M O R A N D U M   O P I N I O N

Timothy Philip Moreno was charged with the murder of Francisco Javier Garza in two paragraphs. The jury found Moreno guilty of murder as alleged in the second paragraph of the indictment: Moreno, intentionally and knowingly, with the intent to cause serious bodily injury to an individual, Garza, committed an act clearly dangerous to human life—shooting him in the head with a deadly weapon, a firearm—that caused the death of Garza. The jury assessed his punishment at fifty years in prison. Moreno appeals. We affirm.

In four issues, appellant argues that (1) the trial court erred in allowing the testimony of Edgar Delapaz; (2) the trial court erred in allowing the testimony of Patricia Garcia concerning prior assaults by appellant against her; (3) the trial court erred in preventing appellant from

arguing that the reasonableness of his conduct should have been viewed as appellant perceived the situation; and (4) the trial court erred in instructing the jury that the law of self-defense may be applied to a murder charge but not to a manslaughter charge.

*Background Facts*

The home of appellant and his mother had been attacked by vandals. The mother moved to a motel, and appellant was staying at the home of his girlfriend, Patricia. Appellant had been living there a week before the incident. Appellant was sixteen years old at the time.

Appellant and Patricia began drinking Joose, a malt liquor beverage, early in the day; they continued to drink until the early morning of April 18, 2009. Patricia said she received a call from Edgar Delapaz; however, Delapaz testified that she called him. Because of the call, Patricia and appellant began arguing. Patricia remembered that Edgar and appellant talked on the phone and that appellant wanted to fight Edgar. Eventually, both calmed down and "were going to catch a cool." Patricia explained that meant that they were not going be friends but that they were not going to have a problem with each other.

Patricia said that, later that night, appellant talked about how he wanted to fight Garza. Patricia and Garza had dated and had a sexual relationship before she began going with appellant. Appellant told her to call Garza. Because appellant did not have any minutes on his phone, she sent a text message to Garza. According to Patricia, Garza and appellant began texting back and forth concerning where they would meet. They sent text messages back and forth for about an hour.

Sometime later, Patricia heard loud music outside and went to see if it was Garza driving by her house. Appellant followed her outside. They saw Garza do a U-turn and come back. Patricia said that appellant ran back in the house, got his gun, and came back out. She claimed that she went back inside to find some clothes to put on. Patricia said that she did not see appellant shooting at Garza but that she heard the shooting. When she went outside again, she saw that the back window of Garza's blue Ford Explorer was "busted out." She also saw Garza lying in the street. Patricia said that she did not see Garza with a gun nor did she see his passenger, Gilbert Valenzuela, with a gun. When the passenger got out of the car, he took off running. Appellant left in Garza's Explorer.

2

Patricia's mother said that the loud music woke her son, who woke her. She then heard a few gunshots. She looked through a window and saw Garza's Explorer with its lights on. By the time she went outside, the car was gone.

Garza's passenger, Gilbert, testified that Garza was his uncle and that he lived with Garza at that time. He was aware that Garza had received text messages from appellant that night. Gilbert did not know the content of the text messages, but he could tell that Garza was angry about them. He was with Garza when they went to Patricia's house around 4:00 a.m. Gilbert thought that Garza and appellant were going to fight. He did not know that appellant had a gun. He claimed that neither he nor Garza had a gun. Gilbert said that Garza was standing outside the Explorer on the driver's side and was texting when Patricia and appellant came out of the house. Garza was standing between the open door and the body of the Explorer.

According to Gilbert, Patricia came out first, and then appellant came out running and shooting. Gilbert looked back, saw the window shot out, became scared, opened the door, and ran toward a fence. The last time he saw his uncle, appellant was near his uncle. Gilbert saw the Explorer being driven away, and he thought that his uncle was in it. During cross-examination, Gilbert said that he had not been with Garza during the entire night but that Garza had drunk a few beers. Gilbert said that he was only fourteen years of age and that he had not been drinking. He further said that he did not know Jennifer Carrion or Juan Angel Narvaez and that neither had talked to Garza that night.

Officers Mary Guitar and Damien Hutchison with the Abilene Police Department arrived at the scene at 5:40 a.m. Patricia was trying to do CPR on the victim, and she was covered in blood. The body was near the middle of the street. Patricia told Officer Guitar that the victim was an ex-boyfriend. Patricia's mother was also standing off to one side. Someone named Carmen told Officer Guitar that appellant had fired the shots and that Patricia had had relationships with both Garza and appellant.

Daniel Gonzales testified that appellant is his nephew. Gonzales lived with his sister in Merkel, and appellant came to her house that night, driving a blue Ford Explorer. Daniel remembered seeing the back window bashed in and another window broken. Appellant was "all shaky and scared," and Daniel asked him what was wrong. Appellant told Daniel that "he shot a guy" in Abilene and that it was the same person who had beaten him up in the past. Daniel said that he noticed a rifle in the Explorer, but appellant would not tell him where he got the rifle.

3

Appellant told Daniel that he did not mean to kill Garza; he was just trying to scare him off. Daniel told him to go back to Abilene and turn himself in.

Appellant did not go directly back to Abilene, but he did turn himself in later that day. The Explorer was found by the police in an abandoned old barn located approximately four miles from Merkel. Both license plates had been removed, and it appeared that someone had wiped the Explorer down to remove blood splatters.

Officers found four .22 caliber shell casings in the street and live .22 caliber rounds lying on the floor in Patricia's house. A forensic specialist with the Abilene Police Department noted that one bullet hole was in the left corner on the driver's side, just to the right of the taillight, and that another bullet hole was in the back end of the Ford Explorer. Dr. Nizam Peerwani, a forensic pathologist, performed the autopsy. He testified that Garza had received one gunshot wound to the right side of his right thigh, indicating that the shooter was on the right side, slightly in front of Garza. He then described the second gunshot wound that was just above Garza's right eyebrow; the bullet entered and went from right to left and slightly downwards, indicating that the shooter had to be in the front. According to Dr. Peerwani, the wound to the thigh would have been very painful; Garza would have collapsed and would not have been able to run. But Garza died from the wound to his head. Dr. Peerwani found the bullet in Garza's thigh and the bullet in his skull.

Jennifer and Angel were witnesses for appellant. Jennifer lived with Patricia and her mother. She testified that she talked to Garza about 4:00 a.m.; she had sent a text to Garza because she had heard of the confrontation between him and appellant. She claimed that she told Garza not to go to Patricia's house because she knew that appellant was drunk and had a gun. Although she did not see Garza with a gun, Garza told her that "he had something for [appellant]." Jennifer interpreted the statement to mean that Garza had a gun. During cross-examination by the State, Jennifer admitted that she never once mentioned in her statement to the police that she had seen Garza and visited with him that morning.

Angel said that he had been drinking with Jennifer that night and that he had also visited with Garza around three or four o'clock that morning. Angel went out to the curb to visit with Garza, who was in his car. Angel talked with him for about twenty minutes. Angel said that he tried to calm Garza down and that Garza had shown him a black pistol, pulling it from under the driver's seat. After Garza left, Angel called appellant and told him that Garza was coming and

4

that he had a gun.  Angel also admitted that he had not mentioned in his statement to the police that he had visited with the victim that morning.  Neither Jennifer nor Angel mentioned seeing Gilbert with Garza.

Appellant testified that he and Patricia started drinking Joose early and continued to drink throughout the night.  He said that a friend, Feto, brought him the rifle and that he kept it under the bed.  He stated that he and Patricia argued about his seeing a girl who was Patricia's cousin.  Patricia bit him and hit him.  He hit her back, and he admitted that he had hit Patricia before.  He acknowledged that his assaults on Patricia had caused problems with Garza.

Appellant said that Angel had called him, telling him that Garza was coming and that he had a gun.  Appellant claimed that he did not have a gun when Patricia first went outside to see if it was Garza playing the loud music.  As Garza made a U-turn, appellant saw that there were two people in the car.  He ran back in the house to get the gun from under the bed.  When he returned, he saw the two getting out of the Ford Explorer.  He claimed he saw Gilbert with a gun and said that was when he started shooting.  Gilbert ran off, and Garza was coming around the car.  Appellant claimed that he was shooting from the hip just to scare Garza.  He thought he only fired four times before the gun jammed.  He panicked, took the rifle with him, and left in Garza's Explorer to go to his aunt's house in Merkel.

Appellant testified that he sawed up the rifle with a wood saw and destroyed it.  He admitted that he knew there was a thirty-round clip in Patricia's house that fit the rifle.  Appellant agreed with the prosecutor that the evidence showed that one shot hit the tail of the Explorer, one shot went through the back window and out the back side window, one shot hit Garza in the thigh, and the fourth shot hit Garza in the head.  The prosecutor then asked him if his testimony was that he was shooting at Gilbert.  Appellant said that he was shooting that way, but he did not hit Gilbert.

Appellant said that two men named Adam and Andrew followed him to where he hid the Explorer in the abandoned barn; however, he did not know their last names.  He claimed that he talked to them before he left his aunt's house.  He also claimed that they wiped the Explorer down and that they took the stereo.  When asked how the two men happened to help him, appellant said that Angel had provided them.  Adam and Andrew then gave appellant a ride back to Abilene where he later turned himself in to the police.

5

*Standard of Review for Appellant's First Two Issues*

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). The trial court's ruling will not be reversed on appeal absent a clear abuse of discretion. *Id.* An abuse of discretion occurs when "its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.* The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985).

*Admission of Evidence Issues*

Delapaz began his testimony by stating that he was eighteen years old at the time of the events on April 18, 2009. When the State asked questions concerning a telephone call he received from Patricia that night, appellant objected that the subject had no relevance to the death of Garza and that the testimony would be prejudicial. A hearing was held outside the presence of the jury; the trial court overruled appellant's objection. Before the jury, Delapaz said only the following about the telephone conversation he had with appellant:

> A. Just telling me that he thought -- somebody had told him I was talking s--t about him and for me to go over there, and who I was with, that he was -- he wasn't -- he was no bitch, and that's when I said -- I told him, I'm not a bitch either, we don't know each other, I don't have no problems with you, I never said anything about you. That's when he said that he doesn't give a f--k. He's f----d up. He doesn't care who I take over there, and after that I just told him, I'll be -- I said, Let me find a ride and I'll be there in a minute, and I hung up the phone after that.
>
> Q. What did you do?
>
> A. Nothing. I went home.

During cross-examination, appellant's counsel asked Delapaz what appellant meant when appellant said he was "f----d up": "Do you think that meant that he had been drinking?" Delapaz said it meant appellant had been drinking or had been using drugs, but Delapaz did not know which he meant. Delapaz said that he did not see appellant that night.

When Patricia began discussing the telephone call with Delapaz, appellant objected again that the conversation with Delapaz was irrelevant and prejudicial. The trial court overruled the objection. There was a brief mention of appellant's challenge to a fight with Delapaz by Patricia

6

in her testimony; however, it was immediately followed by Patricia's statement that Delapaz and appellant had calmed down, were "cool" with each other, and did not have a problem with each other. The testimony was admissible because it was relevant to appellant's state of mind. *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005) (all relevant circumstances to show the condition of the mind of the accused at the time of the offense). It demonstrated that appellant was intoxicated and angry about Patricia's talking and texting with former boyfriends that night. The evidence provided insight into appellant's motive—jealousy—as well as his state of mind during that night. The evidence was not unfairly prejudicial. *See Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999) (discussion of unfair prejudice); *Lopez v. State*, 314 S.W.3d 54, 62 (Tex. App.—San Antonio 2010, pet. ref'd). We cannot say that the trial court abused its discretion in finding that the testimony was admissible. Appellant's first issue is overruled.

In appellant's second issue, he argues that the trial court erred in admitting Patricia's testimony of appellant's prior bad acts against her because the bad acts were not included in the State's response to his TEX. R. EVID. 404(b) request. During cross-examination, appellant reviewed with her the events that occurred after she and appellant finished talking with Delapaz, e.g., that they had an argument, that she hit or bit appellant, that they continued drinking, that they later heard the loud music and went out to see that it was Garza driving past, and that Patricia did not see Garza with a gun. Appellant then asked if the police had asked her whether she had seen appellant that night. Patricia responded that she lied to the police. That response was early in the cross-examination. Appellant then obtained her admission that there were other inconsistent statements in her testimony at trial. She was consistent, however, in stating that she did not see Garza or Gilbert with a gun.

After the cross-examination, the State requested a hearing outside the presence of the jury. The State wanted to question Patricia about why she initially lied to the police by stating that she had not seen appellant. In response, appellant argued that there was no need to explain why she lied because she admitted that she lied to the police. The trial court overruled appellant's objection. The State asserts that, because appellant had attacked her credibility a number of times, it was reasonable for the court to allow the State to rehabilitate her, citing *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005) (extraneous offense evidence admissible to rehabilitate an impeached witness). An appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made.

7

*Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Before the jury, Patricia briefly testified that she lied to the police because she was scared of appellant. They fought a lot, and he would hit her; it was normal for them to fight. She admitted that she bit and hit him during that night. She also admitted that Garza did not like it when appellant hit her. After reviewing the record, we cannot say that the trial court abused its discretion in allowing the brief testimony where Patricia claimed she lied because she was afraid of appellant. The trial court's ruling was "within the zone of reasonable disagreement."

Even if the trial court erred in allowing the testimony of Delapaz and Patricia, there was no harm. The errors would have been nonconstitutional errors; therefore, the analysis is under TEX. R. APP. P. 44.2(b). When evaluating harm from nonconstitutional error flowing from the exclusion or admission of relevant evidence, we examine the record as a whole. If we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). As appellant points out in his brief, there was ample evidence that it was normal for Patricia and appellant to fight; she was not so afraid of appellant that she did not fight with or hit him. It is extremely doubtful that the jury gave much credence to Patricia's testimony concerning why she lied to police. And Delapaz only stated that appellant told him that "somebody had told [appellant] [Delapaz] was talking s--t about him" and that he wanted Delapaz to come over to talk about it. The testimony did not affect appellant's substantial rights. Appellant's second issue is overruled.

*Self-Defense Standard*

In his third issue, appellant points out that, during argument, his counsel attempted to argue as follows:

> [Appellant is] 16 years old and he's scared. What happens if those guys
> with guns get out and he's standing by the house or he's in the front -- or he's in
> that door and they start shooting at him? Look at it through his eyes, the eyes of a
> 16-year-old boy.

The State objected on the ground that this line of argument went against the jury charge. The State pointed out that the jury had to "consider a reasonable person standard with the facts that were known to the accused." The trial court sustained the objection.

8

The charge contained detailed instructions requiring that, under the law of self-defense, the actor "reasonably believes that such deadly force is immediately necessary to protect oneself against the other person's use or attempted use of unlawful deadly force." The application paragraphs also required a reasonable belief by appellant:

> Therefore, with regard to Paragraph Two in the indictment, if you believe from the evidence that Timothy Philip Moreno would be justified in using deadly force to-wit: by shooting Franciso Javier Garza in the head with a firearm, an act clearly dangerous to human life, while intending to cause serious bodily injury because Timothy Philip Moreno reasonably believed the use of deadly force was immediately necessary to protect himself against Francisco Javier Garza's or Gilbert Valenzuela's use or attempted use of unlawful deadly force, then you will find the Defendant not guilty of Murder as alleged in Paragraph Two of the indictment.
>
> If you find from the evidence beyond a reasonable doubt that at the time and place in question the Defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that Defendant, under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Francisco Javier Garza's or Gilbert Valenzuela's use or attempted use of unlawful deadly force, then you should find against the Defendant on the issue of self-defense.

Appellant contends that he was denied the opportunity to argue that the jury should view matters as appellant viewed them at the time he acted, that being denied his jury argument amounted to a denial of the right to counsel, that the error was of constitutional magnitude, and that the denial effectively negated the evidence that appellant was afraid and thought that Garza was armed. Appellant mischaracterizes the State's objection and the court's ruling. The State objected to make clear that the jury should view matters as a reasonable and prudent person, under the same or similar circumstances as appellant, would have viewed them. They should not be viewed "through the eyes" of this particular sixteen-year-old boy. Appellant was incorrect in his statement to the trial court that the jury "[had] to consider the things the way he saw it, what's reasonable for him."

It is well settled that self-defense is viewed from a reasonable-person standard. The test assumes that a defendant may act on appearances as viewed from his standpoint, but "the test also assumes the 'ordinary prudent man test of tort law.'" *Werner v. State*, 711 S.W.2d 639, 645 (Tex. Crim. App. 1986). The issue in *Hamel v. State*, 916 S.W.2d 491 (Tex. Crim. App 1996),

9

cited by appellant, was whether the trial court erred in denying appellant's request for jury instructions on self-defense and defense of a third person. The *Hamel* court noted that *Werner* involved the propriety of the exclusion of evidence relating to the Holocaust syndrome, not a jury instruction issue. The court stated, "*Werner* should not be interpreted to preclude a self-defense instruction where the defendant reasonably perceives that he is in danger, even though that perception may be incorrect." 916 S.W.2d at 493. The *Hamel* court held that the trial court erred in denying the instructions on self-defense. The term "reasonably believes" in Section 9.32 of the Texas Penal Code[1] encompasses the traditional holding that a suspect is justified in defending against danger as he "reasonably" apprehends it. *Id.*

More recently, the Court of Criminal Appeals again reminded us that a belief "is a 'reasonable' one" if it "'would be held by an ordinary and prudent man in the same circumstances as the actor.'" *Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010) (quoting TEX. PENAL CODE ANN. § 1.07(a)(42) (West 2011)). "Reasonable belief" is defined by the Penal Code as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Section 1.07(a)(42). The law examines "reasonableness" from the perspective of an ordinary and prudent person.

During the trial, the jury was told that, at the time of the offense, appellant was sixteen, Patricia was fifteen, Delapaz was eighteen, Gilbert was fourteen, and the victim was nineteen. The jury was well aware of the ages of the teenagers who were involved that night. Counsel for appellant began his closing argument by stating that this was a tragic case "about kids doing things that kids shouldn't be doing." Appellant's counsel carefully reviewed the evidence in a light that supported appellant's self-defense argument, including that Angel called and told him that Garza had a gun; that appellant was "already scared" when he saw that there were two people in the car, not just one; and that appellant said he saw Gilbert with a gun. After the objection and ruling discussed herein, which occurred midway in his argument, appellant's counsel argued that appellant did not have to retreat because he was living at Patricia's house, that appellant was reasonable in believing his friend Angel, that appellant thought he saw a gun, and that the jury charge required only a perceived threat.

---

[1]TEX. PENAL CODE ANN. § 9.32 (West 2011).

The trial court did not err in sustaining the State's objection. A review of the record reveals that appellant was not denied any proper argument or his right to counsel. There would have been no harm even if the court had erred, which it did not. Appellant's third issue is overruled.

*Self-Defense and Manslaughter*

In appellant's fourth and final issue, he argues that the trial court erred in stating in the jury charge that the law of self-defense does not apply to a manslaughter charge. Counsel moved to strike that sentence, but the trial court overruled his objection.

When an appellant claims jury charge error, the appellate court must first determine whether the charge was erroneous. If there was an error, the court then determines whether the error was harmful to the accused. *Olivas v. State*, 202 S.W.3d 137, 143–44 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Appellant timely objected to the charge; therefore, if there was an error, we may affirm only if no harm resulted to the accused. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).

Appellant relies on *Jordan v. State*, 782 S.W.2d 524, 527 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd); *Withers v. State*, 994 S.W.2d 742, 745–46 (Tex. App.—Corpus Christi 1999, pet. ref'd); and *VanBrackle v. State*, 179 S.W.3d 708, 714–15 (Tex. App.—Austin 2005, no pet.). In *Jordan*, there was evidence that Jordan acted intentionally: he grabbed his pistol, cocked it, got out of his cab, and pointed the gun at Parker's chest. However, there was also evidence of recklessness: his actions with the gun, the men arguing and shoving, and Jordan's testimony that he did not know whether he pulled the trigger. The *Jordan* court held that the jury charge should have applied self-defense to involuntary manslaughter.

In *Withers*, the defendant was convicted by a jury of injury to a child. *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2012). On appeal, Withers challenged the trial court's failure to include jury instructions on self-defense. Withers was a diagnostician at the school, working with "special education" children. Hector Vasquez was twelve years old at the time and a special education student. Although mentally retarded and physically handicapped, Hector had significant upper body strength, particularly when emotionally excited. Hector got into an argument with a fellow student. Withers saw Hector strike the other student a hard blow, and she attempted to intervene. There was a struggle, and Hector ended up, at least briefly, facedown on the floor while Withers kept pressure on his back to keep him down for a few moments.

11

Based on the evidence, the appellate court reversed, finding that Withers was entitled to a jury instruction on self-defense.

In *VanBrackle*, Johnnie Weston testified that the defendant confronted him in front of a store. The defendant was brandishing a pistol and demanding that Weston pay him money. Weston said that he told appellant that he did not owe the money and that he then grabbed the barrel of the pistol. They began scuffling over the gun, and a third person began hitting Weston's hand, which was holding the gun, with a two-by-four. Weston said that he released his grip on the pistol and fell facedown on the ground; appellant then shot him in the back. A number of witnesses supported Weston's version; other witnesses said they saw Weston reach into his pocket and pull out a gun. Appellant was convicted of attempted murder and aggravated assault. The appellate court reversed and remanded, holding that the trial court erred by refusing to instruct the jury on the law of self-defense.

The State points out that Texas courts have often concluded that a defendant who claims to have acted in self-defense (involving intentional conduct that is justified) cannot also claim to have acted recklessly.[2] For that proposition, the State cited *Nevarez v. State*, 270 S.W.3d 691, 695 (Tex. App.—Amarillo 2008, no pet.); *Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); and *Avila v. State*, 954 S.W.2d 830, 843 (Tex. App.—El Paso 1997, pet. ref'd). The State concedes that, under certain circumstances, a defendant is entitled to an instruction on self-defense where a charge requires the mental state of recklessness. *Alonzo v. State*, 353 S.W.3d 778 (Tex. Crim. App. 2011); *Jordan*, 782 S.W.2d at 526–27. The State asserts, however, that self-defense is not applicable to counter a manslaughter charge when the evidence shows the defendant was acting intentionally in self-defense, not merely recklessly.

The State relies on *Alonzo* for its asserted proposition. The *Alonzo* court distinguished *Nevarez*, *Martinez*, and *Avila* as follows:

> The cases cited by the Court of Appeals for the proposition that "Texas courts have routinely noted that an individual cannot recklessly act in self-defense" all dealt with murder defendants who argued self-defense and then requested that the jury be charged with the lesser-included offense of manslaughter. The very reason for denying the manslaughter charges was that the defendants' evidence was that in committing the homicide they acted intentionally in self-defense, not merely recklessly. We do not call these cases into question.

___

[2] A person acts recklessly if he is "aware of but consciously disregards a substantial and unjustifiable risk." TEX. PENAL CODE ANN. § 6.03(c) (West 2011). The assertion of self-defense is an assertion that his conduct was justified. *See Id.* §§ 9.02, 9.31, 9.32.

12

*Alonzo*, 353 S.W.3d at 782. The majority in *Alonzo* noted that, in all three cases, the defendant in a murder trial admitted purposefulness of actions that led to death and argued self-defense; thus, he was not also entitled to a manslaughter charge. *Id.* at 780 n.8, 782.

But in this case, the trial court included manslaughter in the jury charge. The trial court found that the evidence raised the application of self-defense to the murder charges. Because the trial court also included manslaughter in the jury charge, we read *Alonzo* to require that it should have stated that self-defense did apply to manslaughter. Both the majority and the concurring opinions noted that the legislature has codified the doctrine of self-defense. Both pointed out that there is nothing in the self-defense statute that limits self-defense to offenses with an intentional or knowing culpable mental state; therefore, a defendant is entitled to jury instructions on this statutory defense when it is raised by the evidence. *Id.* at 783–84. The trial court erred in refusing to include an instruction that the law of self-defense may also be applied to the manslaughter charge.

Having found that the trial court erred, we must determine whether appellant was harmed by the error. The applicable statutory standard is whether "the error appearing from the record was calculated to injure the rights of defendant." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003). Earlier, we quoted application paragraphs relating to the second paragraph of the indictment. The jury rejected appellant's self-defense justification and found that appellant intentionally and knowingly, with the intent to cause serious bodily injury to Garza, committed an act clearly dangerous to human life: shooting him in the head with a deadly weapon, thereby causing the death of Garza.

The evidence fully supported the jury finding that appellant fired the rifle "with intent to cause serious bodily injury." There was testimony by Gilbert that appellant ran toward Garza, firing the rifle four times, and that Gilbert last saw appellant very close to Garza. The police found the four .22 caliber casings in the street. Dr. Peerwani testified that the shot to Garza's thigh would have made him collapse and unable to run. The shot to his head caused Garza's death. The shot to Garza's head was on a slightly downward trajectory, indicating that Garza was falling or that appellant shot Garza after he fell. Appellant testified that he intended to shoot the gun but that he only wanted to scare Garza and Gilbert. He remembered firing the rifle four times before it jammed.

If the jury had convicted appellant of manslaughter, the omission of the application of self-defense to manslaughter might have been harmful. In both *Alonzo* and *Jordan*, the defendant was acquitted of murder and convicted of manslaughter. Because the jury convicted appellant of murder, the trial court's charge error is harmless in this case. It is very unlikely that this same jury would have unanimously availed itself of a self-defense option for the manslaughter charge. To do so would have required the jury to first unanimously acquit appellant of the greater murder charge and then unanimously accept appellant's assertion that he intentionally acted in self-defense and should not be found guilty of manslaughter. Once the jury convicted appellant of the greater offense of murder, it had no reason to then consider whether appellant might be guilty of the lesser included offense of manslaughter under the trial court's instructions. We conclude that any error in refusing to instruct the jury on self-defense as to the lesser included manslaughter offense was entirely harmless. Appellant's fourth issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


December 13, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.