# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00272-CR

**Gerald VanBrackle, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. 9034085, HONORABLE BRENDA P. KENNEDY, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Gerald VanBrackle guilty of attempted murder and aggravated assault. *See* Tex. Pen. Code Ann. §§ 15.01, 19.02 (West 2003), § 22.02 (West Supp. 2004-05). After finding that appellant had two previous felony convictions, the district court imposed forty-year prison sentences for each offense. Among the issues raised on appeal is appellant's assertion that the trial court erred by refusing to instruct the jury on the law of self-defense. We will sustain this contention, reverse the judgments of conviction, and remand for a new trial.

### *Evidence*

It was undisputed at trial that appellant shot Johnnie Weston on the afternoon of December 14, 2002, outside a neighborhood grocery store at 14th Street and Cedar Avenue in

Austin. There was, however, considerable dispute with respect to the circumstances surrounding the shooting.

### State's witnesses

Weston testified that Lee Standberry gave him a ride to the grocery store to purchase cigarettes. Outside the store, appellant confronted Weston brandishing a pistol and demanding that Weston pay him the money he was owed. Weston said he told appellant that he did not owe him any money. Weston then grabbed the barrel of the pistol and "we started scuffling over the gun." A third person who was later identified as Billy Charles Warren began hitting Weston with a two-by-four or large stick. Weston said that he released his grip on the pistol and fell face-down on the ground. According to Weston, appellant then shot him in the back.

Weston testified that someone went through his pockets as he lay in the street after being shot. He denied being armed. Weston also testified that appellant had previously wrecked a car borrowed from Weston. He said that this had angered him at the time, but he "didn't stay mad long." Weston testified that about one week before the shooting, appellant threatened him with a pistol at the same grocery store.

One of the doctors who treated Weston testified that the bullet entered his body "from the side, posteriorly from sort of the shoulder, and went straight into the spinal canal." The spinal trauma left Weston a paraplegic.

Standberry testified that after dropping Weston off at the store, he had continued on to a nearby tire shop. While he was at the tire store, someone drove up and said, "There's a guy

2

laying in the middle of the street, looks like he is dead." Standberry continued, "So everybody really ran around there and looked. And I said, Man, that's Johnnie laying in the middle of the street." Standberry testified that he remained with Weston until medical personnel and the police arrived. He denied taking anything from Weston's pockets. He also confirmed Weston's account about the incident at the store one week earlier.

Kyle Taylor was approaching the 14th and Cedar intersection in his car when he saw three men fighting in the street. Taylor testified that one man was lying on the ground while the other two stood over him. "[O]ne man was punching the man that was down on the ground. And the other one looked like he was trying to take something out of his hand." As Taylor was looking for a place to park, he heard a single gunshot. He looked back at the fight scene, where he saw the man lying in the street and the other two men walking away.

Elizabeth Rodriguez lives on Cedar Avenue near the grocery store. On the day in question, her attention was drawn by the sound of an argument. She stepped outside and saw two men "shouting at each other and shoving each other." They appeared to be wrestling over something. A third man walked up and began to hit the legs of one of the struggling men. The latter man turned and began to run away. The man with whom he had been fighting "lifted up his hand," which was holding a pistol, and shot the fleeing man.

Theodis Daniel, Sr., owns an air conditioning repair shop on Cedar Avenue across the street from the grocery store. He was working at the shop when he heard a "commotion." He looked across the street and saw appellant (whom he knew) and another man "tussling, but I did not know what they were—had in their hands." A third man who was armed with a "stick or limb or

3

whatever" joined the fray. The men then separated and Daniel could see that appellant was holding a handgun. "As he got the—after they broke apart, the individual just kind of turned a little bit to the—to his left, he kind of turned a little bit to the left, and then he [appellant] just fired." Daniel testified that the man who was shot had "turn[ed] away . . . as if maybe to flee or I don't know, maybe get out." Daniel was of the opinion that appellant deliberately shot Weston.

Theodis Daniel, Jr., was working on a car outside his father's shop on the afternoon of the shooting. His attention was drawn by "a bunch of movement" in the street. Two men, one of whom he recognized as appellant, appeared to be "wrestling or play-fighting." Appellant called out to a third man to "hit him, hit him." The third man "popped him one good time" in the lower back. Appellant and the man he was fighting fell to the ground, and Daniel could then see that they were struggling for control of a pistol. Appellant "snatched [the gun] out of his hand," then he "[t]urned it around with his hand and shot him one time, and that was it." Daniel testified that the victim "was trying to run. You know, I could have been wrong, but he just popped him and he fell face first to the ground." It was Daniel's impression that appellant had been defending himself from Weston's initial aggression, and that appellant had taken the gun from Weston and shot him "just to make sure." He said that Weston had nothing in his hands when he was shot, that he saw no other weapons, and that no one took anything from Weston as he lay in the street before the police arrived.

### Defense witnesses

Billy Charles Warren testified that he and appellant were with a group of men standing outside the grocery store when Weston, who appeared to be intoxicated, arrived. Warren

was speaking to another individual when he sensed "a little commotion." He turned and saw appellant and Weston wrestling. As Warren watched, Weston reached in his pocket and pulled out a gun. Appellant began to struggle for control of the gun and called out to Warren for help. Warren said, "I don't know where I got the stick from, but I starting hitting him." All three men fell to the ground. Warren said he did not see what happened next, but that he heard the gunshot. "All I know is when I turned back around, the gun was in [appellant's] hand." He and appellant then fled.

Alton Earl Jones was one of the men standing outside the grocery store. He testified that as Weston approached, appellant asked him what he wanted. "[T]hat's when he [Weston] went in his pocket and fumbled and pulled out the gun." Weston cocked the pistol and walked closer to appellant. Appellant pushed Weston's arm "up in the air" and they began to wrestle. Appellant called out for help and Warren hit Weston with the stick. Appellant and Weston fell to the ground and the gun fell loose. Jones said that each man scrambled for the gun as they got up from the ground. "[Appellant] ended up getting the gun first, and then Mr. Weston got up, he started fumbling in his pocket, like, for something." Asked when the gun was fired, Jones replied, "When [appellant] thought his life was in danger, because he was still fumbling in his pocket like he had another object." According to Jones, after the shooting Standberry took "an object" from Weston's pocket.

Jesse Shaw testified that he walked out of the grocery store and saw Weston pointing a gun at appellant. Shaw said that appellant "tried to defend himself" by "trying to get the gun away from him." Appellant shouted for help and Warren, who Shaw did not then know, hit Weston on the back of his leg. Appellant and Weston fell, but they continued to fight over the gun. Shaw

5

testified, "Mr. Weston got to his feet, and Mr. VanBrackle got up to his feet. You know, Mr. Weston meant like he was getting ready to pull something" out of his pants pocket. "And that was it. The gun went off." Shaw said that appellant did not aim the gun at Weston. Instead, when appellant picked up the gun, it "just went off." Shaw testified that he there was no question in his mind that Weston initiated this incident.

## *Discussion*

The district court denied appellant's request for a self-defense instruction. The court did, however, instruct the jury on what was referred to at trial as the "accident defense." *See Rogers v. State*, 105 S.W.3d 630, 637 (Tex. Crim. App. 2003); *Williams v. State*, 630 S.W.2d 640, 644 (Tex. Crim. App. 1982). The instruction told the jurors that "a person commits an offense only if he voluntarily engages in conduct," and it directed them to acquit appellant if they believed or had a reasonable doubt that "the shooting was a result of an accidental discharge of the gun while Johnnie Weston and the defendant were struggling or scuffling for the possession of the gun and was not a voluntary act or conduct of the defendant." *See* Tex. Pen. Code Ann. § 6.01(a) (West 2003). It appears from the record that the trial court believed that the submission of this instruction precluded the submission of an instruction on self-defense. When, after both sides had closed, defense counsel renewed his request for a self-defense instruction, the court replied, "On yesterday, I explained to you that you could not have both the accident and the self-defense." The court added, "I have included the accident in the Court's charge, thereby prohibiting you from having the self-defense charge."

In our review of the trial court's ruling, we will first address the question of whether there was evidence raising self-defense as an issue. Finding that there was, we will then address the court's conclusion that the jury instruction regarding involuntary conduct disentitled appellant to an instruction on self-defense.

**Was self-defense raised?**

A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of the trial court's opinion about the credibility of the defense. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). This rule is designed to insure that the jury, not the trial court, will decide the relative credibility of the evidence. *Granger*, 3 S.W.3d at 38. A defendant need not testify in order to raise a defense. *Boget v. State*, 40 S.W.3d 624, 626 (Tex. App.—San Antonio 2001), *aff'd*, 74 S.W.3d 23, 31 (Tex. Crim. App. 2002). Defensive issues may be raised by the testimony of any witnesses, even those called by the State. *Jackson v. State*, 110 S.W.3d 626, 631 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Shelvin v. State*, 884 S.W.2d 874, 878 (Tex. App.—Austin 1994, pet. ref'd). In deciding whether a defensive theory is raised, the evidence is viewed in the light most favorable to the defense. *Granger*, 3 S.W.3d at 38.

With certain exceptions not applicable here, a person is justified in using deadly force in self-defense if he reasonably believes that deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force, and if a reasonable person in his

7

situation would not have retreated. Tex. Pen. Code Ann. § 9.32. A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). Section 9.32 encompasses the traditional holding that a person is justified in defending against danger as he reasonably apprehends it. *Id*. Whether a defendant's beliefs were reasonable under the circumstances is a fact question for the jury to decide, not a preliminary question for the court to evaluate in determining whether the defense is raised. *Hayes v. State*, 728 S.W.2d 804, 808 (Tex. Crim. App. 1987); *see Granger*, 3 S.W.3d at 39 (reaffirming *Hayes* and applying it to mistake of fact defense).

The State argues that appellant was not entitled to a self-defense instruction because he did not "elicit or produce evidence that he did in fact reasonably believe deadly force was immediately necessary to protect himself from the use or threatened use of deadly force, and that he was relieved of the duty to retreat." The State refers us to the holding of the Dallas court of appeals that to raise the issue of self-defense, there must be "evidence of [the defendant's] state of mind or observable manifestations of [the defendant's] state of mind." *Reed v. State*, 703 S.W.2d 380, 385 (Tex. App.—Dallas 1986, pet. ref'd). This argument raises the question posed in *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984): "[W]hen the defendant does not testify, what kind of testimony is needed to raise the issue of self-defense, since [self-defense] focuses on the defendant's subjective state of mind?"

In *Smith*, the defendant stabbed the complainant after the complainant intervened in an argument between the defendant and the defendant's sister. *Id*. at 585-86. According to the State's evidence, the defendant had armed himself with a knife and was attempting to enter the house

8

in which his sister had taken refuge when the complainant grabbed him and pulled him away from the house. *Id*. at 586. The complainant then entered the house, took a gun away from the defendant's sister, left the house, and placed the gun in the trunk of his car. *Id*. After this, the defendant again tried to enter the house and stabbed the complainant when he tried to stop him. *Id*.

A defense witness testified that when the complainant left the house carrying the sister's gun, he pointed the gun at the defendant "like he was going to—he was shooting at [the defendant]." *Id*. This witness went on to say that "the complainant grabbed [the defendant] and the two began to scuffle. [The witness] testified that she heard the complainant say to [the defendant], 'do what he had to do, don't be messing with Darlene and if he wanted to hurt somebody, hurt him or he was going to hurt him.'" *Id*. A second defense witness testified that after the altercation, the defendant told her that the complainant "had been trying to hurt him" and that "he had taken the gun away from the complainant and had stabbed him." *Id*. The court of criminal appeals held that the testimony of these two witnesses, "although not strong and convincing, raises the issue of self-defense." *Id*. at 587.

We believe that the cause before us is analogous to *Smith*. Four witnesses testified that the altercation between appellant and Weston began when Weston pointed a pistol at appellant. According to these witnesses, appellant responded to this assault by grabbing the pistol, pushing it away, and calling for help. This was an "observable manifestation" of appellant's belief that it was necessary to defend himself against Weston's use or threatened use of deadly force. Indeed, three witnesses testified to their impression that appellant was defending himself against Weston's attack. Two witnesses testified that after appellant succeeded, with Warren's help, in disarming Weston and

9

gaining possession of the pistol, Weston began to fumble in his pocket as if to pull out another object.[1] At this point, appellant shot Weston. Viewed in the light most favorable to the defense, the evidence clearly supports a finding that Weston assaulted appellant with a firearm, and that appellant struggled with Weston to defend himself against this assault and obtain control of the weapon. Under these circumstances, we believe that the evidence describing Weston fumbling in his pocket as if to pull out another object was sufficient to raise an issue as to whether appellant reasonably believed that Weston was reaching for another weapon, that retreat was not a viable alternative, and that shooting Weston was immediately necessary to protect himself against Weston's use or attempted use of unlawful deadly force.

We caution that we express no opinion regarding the credibility of the witnesses or the relative weight of their testimony, the proper inferences to be drawn from the evidence, or the reasonableness of appellant's conduct. We hold only that the evidence adduced at trial was sufficient to raise a jury issue regarding the use of deadly force in self-defense. Whether the events in question actually transpired in the manner described by the defensive testimony and whether appellant's conduct was reasonable under the circumstances are fact issues to be determined by a jury.

***Was appellant entitled to inconsistent defenses?***

When the evidence is inconsistent and supports more than one defensive theory, the defendant is entitled to an instruction on every theory raised, even if the defenses themselves are

---

[1] The State argues that there is no evidence that appellant saw Weston reach into his pocket. But if the jurors believed the defense witnesses, they could rationally infer that appellant also saw Weston's movement.

inconsistent or contradictory. *Booth v. State*, 679 S.W.2d 498, 501 (Tex. Crim. App. 1984); *see Johnson v. State*, 715 S.W.2d 402, 406-07 (Tex. App.—Houston [1st Dist.] 1986), *pet. ref'd*, 738 S.W.2d 287, 288 (Tex. Crim. App. 1987). In *Garcia v. State*, 492 S.W.2d 592, 595 (Tex. Crim. App. 1973), the court of criminal appeals held that the evidence entitled the defendant to instructions on both self-defense and accident. Cited in *Garcia* and to the same effect are *Merritt v. State*, 213 S.W. 941, 942 (Tex. Crim. App. 1919); *Carden v. State*, 138 S.W. 396, 397 (Tex. Crim. App. 1911); *Wesley v. State*, 65 S.W. 904, 905 (Tex. Crim. App. 1901). More recently, the court of criminal appeals held that a defendant's request for an instruction on the absence of voluntary conduct (which was granted) was insufficient to alert the trial court that he also wanted an instruction on self-defense. *Rogers v. State*, 105 S.W.3d 630, 640 (Tex. Crim. App. 2003). There is nothing in the *Rogers* opinion to suggest that the defendant was not entitled to instructions on both defensive theories if both were raised by the evidence.

Self-defense, like other chapter nine defenses, justifies conduct that would otherwise be criminal. *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999) (necessity); *Wallace v. State*, 75 S.W.3d 576, 587 (Tex. App.—Texarkana 2002) (self-defense), *aff'd*, 106 S.W.3d 103, 109 (Tex. Crim. App. 2003). In other words, the defendant must "admit" violating the statute under which he is being tried, then offer a statutory justification for his otherwise criminal conduct. *Young*, 991 S.W.2d at 838. Thus, a defendant is not entitled to a jury instruction on self-defense if, through his own testimony or the testimony of others, he claims that he did not perform the assaultive acts alleged, or that he did not have the requisite culpable mental state, or both. *Ex parte Nailor*, 149

S.W.3d 125, 134 (Tex. Crim. App. 2004); *East v. State*, 76 S.W.3d 736, 738 (Tex. App.—Waco 2002, no pet.); *Wallace*, 75 S.W.3d at 587; *Gilmore v. State*, 44 S.W.3d 92, 97 (Tex. App.—Beaumont 2001, pet. ref'd); *Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). "If a defendant . . . categorically denies that he even touched the victim of an alleged assault, he has engaged in no conduct which needs justifying. He has essentially denied that the alleged criminal act ever took place." *Gilmore*, 44 S.W.3d at 97. In each of these cases, *all* the defensive testimony was to the effect that the defendant did not commit the alleged acts, and the defendant was thus not entitled to a self-defense instruction because there was *no evidence* that he acted in self-defense.

Involuntary conduct cannot be a criminal offense. Tex. Pen. Code Ann. § 6.01(a) ("A person commits an offense only if he voluntarily engages in conduct"). As in the opinions cited above, it can be argued that a defendant is not entitled to a self-defense instruction if he consistently asserts that the conduct for which he is on trial was committed involuntarily. This question is not raised here, however, because the defensive evidence was not consistent. While there was testimony that the gun "just went off," there was other testimony supporting a finding that appellant voluntarily and intentionally shot Weston in self-defense. Because there was evidence raising both involuntary conduct and self-defense, appellant was entitled to instructions on both.

We hold that the evidence raised an issue as to whether appellant acted in self-defense, and that it was error to deny the requested instruction on the ground that other evidence supported an instruction on the voluntary conduct issue.

12

***Was appellant harmed?***

Because appellant properly requested an instruction on self-defense, reversal is required if the error was calculated to injure appellant's rights. *Hamel*, 916 S.W.2d at 494; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985 (op. on reh'g). This means no more than that there must be some harm arising from the error. *Almanza*, 686 S.W.2d at 171. We must consider all relevant information revealed by the record, including the entire jury charge, the state of the evidence, and the arguments of counsel. *Id*.

The subject of self-defense came up throughout the trial. Counsel for both parties discussed self-defense with the jury panelists during voir dire. In fact, the prosecutor devoted one-third of his voir dire to the subject. We have already summarized the testimony in detail and will add only that counsel for both parties questioned witnesses, either on direct or cross, regarding matters relevant to self-defense, such as whether anything had been taken from Weston's pockets before the police arrived. During jury argument, the subject of self-defense was first raised by the prosecutor: "Now, I want to go over something else with you, and that is a word that you heard several times, probably from the time of voir dire, and even throughout the trial, and that word, that term is 'self-defense.'" The prosecutor went on to tell the jury that self-defense was not an issue, and had not been included in the court's charge, because it was not raised by the evidence. When defense counsel later suggested in his argument that appellant had been defending himself, the prosecutor objected to "argument about self-defense," and the court instructed the jury to consider only the issues in the court's charge.

The State argues that any claim of self-defense is against the great weight of the evidence. The State points to the location of Weston's gunshot wound, the evidence of appellant's "calm and nonchalant" manner after shooting Weston, the contrast between the "varying testimony" of the defense witnesses and the "cohesive testimony" of the State's witnesses, and the testimony regarding appellant's armed confrontation with Weston one week before the shooting. The State also challenges the credibility of the defense witnesses.

As previously discussed, the medical evidence was that the bullet entered Weston's body from the side, slightly behind his shoulder. The doctor agreed that "it was more like if a person were twisting around." While this testimony is inconsistent with a finding that Weston and appellant were facing each other when the shot was fired, it is also inconsistent with the testimony of some State witnesses that appellant had his back turned and was running away from Weston when the shot was fired.

The testimony regarding appellant's demeanor after the shooting was, like so much of the testimony, contradictory. Daniel Sr. testified that appellant "casually" walked away after shooting Weston. Taylor testified that appellant and Warren "walked away" after the shooting, but "might have been walking a little faster than normal." Shaw testified that appellant "took off running" after the shooting.

Although the defensive testimony can be accurately characterized as varying and inconsistent, the State's assertion that its witnesses presented a cohesive picture is not supported by a review of the testimony. Weston testified that he was lying face-down on the ground when he was shot, but the Daniels testified that Weston was standing and turning as if to flee, and Rodriguez

14

testified that Weston was running away from appellant. Weston testified that appellant approached him brandishing the pistol, but Daniel Jr. testified that Weston "had to be" pointing the pistol at appellant because he saw appellant take the pistol from Weston, turn it, then shoot.

Weston's and Standberry's testimony regarding the incident one week earlier during which appellant demanded money from Weston at gunpoint lends support to the State's theory of the case. But the same witnesses also testified to appellant having wrecked Weston's car, which suggests a motive for Weston to assault appellant and supports the self-defense theory.

The State correctly points out that defense witness Jones was not a particularly credible witness. He admitted having felony convictions for theft, forgery, burglary of a building, assault, and cocaine possession. He was also noticeably evasive during cross-examination. Defense witness Shaw also admitted having two robbery convictions. But Weston had his own credibility problems. He denied being intoxicated on the afternoon of the shooting, but admitted that he was carrying a crack pipe. The medical evidence showed that Weston's blood tested positive for cocaine, lending support to defense testimony that Weston appeared to be intoxicated.

When the issue is raised, it is the State's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. Tex. Pen. Code Ann. § 2.03(d) (West 2003). Had the jury in this cause been properly instructed, it needed only to have a reasonable doubt as to whether appellant's actions were justified by self-defense to render an acquittal. *Id.* From a full examination of the record, we cannot state with confidence that there was no reasonable possibility that the jury would have found that appellant acted in self-defense. *See Boget*, 40 S.W.3d at 627-28. We

15

therefore conclude that the court's refusal to instruct the jury on self-defense caused some harm to appellant. Points of error one and two are sustained.

Because we find that appellant's self-defense points present reversible error, we do not address his other points of error.[2] The judgments of conviction are reversed and the cause is remanded to the district court for a new trial.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Reversed and Remanded

Filed:  November 4, 2005

Publish

_____

[2] We note, however, that the State concedes that the aggravated assault was included within the attempted murder, and that appellant's convictions for both offenses violate the double jeopardy guarantee against multiple punishments for the same offense. *See Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *Cervantes v. State*, 815 S.W.2d 569, 572 (Tex. Crim. App. 1991); *Ethridge v. State*, 648 S.W.2d 306, 306 (Tex. Crim. App. 1983).