# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00470-CR

**Shawn Lynn Parker, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT NO. 12-1383-K368, HONORABLE BURT CARNES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Shawn Lynn Parker of the offense of assault family violence.[1]  Punishment, enhanced by a prior conviction for the offense of injury to a child, was assessed at 18 years' imprisonment and a $10,000 fine.  In a single issue on appeal, Parker asserts that the district court reversibly erred in refusing to instruct the jury on the law of self-defense.  We will affirm the judgment of conviction.

## BACKGROUND

Because the determination of whether Parker was entitled to a self-defense instruction turns on the evidence presented at trial, we will begin by reviewing that evidence in some detail.  The jury heard evidence that the alleged offense occurred on April 23, 2012, in a two-bedroom apartment shared by Parker's then-girlfriend, Melanie Gayton; Gayton's two young children; a female

---

[1]  *See* Tex. Penal Code § 22.01(b)(2)(A).

roommate, Kayla Moore; and Parker. Earlier that day, Gayton testified, she had left her youngest child in Parker's care while she went to work. Upon Gayton's return, however, Moore informed her that Parker had instead departed the apartment earlier that day, leaving Moore to babysit. Adding insult to injury, Gayton recounted, Parker subsequently returned home "really sweaty and slurring his speech," and she perceived that Parker was drunk.

According to Gayton, an argument between the couple ensued, beginning in a bedroom they shared and eventually moving into a living room with an adjacent dining area and kitchen. During the argument, Gayton recounted, she discovered that her debit card was missing. She suspected Parker had used the card to purchase alcohol and demanded that he return it. In response, Parker, according to Gayton, "turned his pockets inside out . . . took his shirt off, and then . . . pull[ed] his pants down" in front of Gayton, Moore, and Gayton's two young children, ostensibly to demonstrate that he did not have the card.[2] At this juncture, Gayton called 911. While she was on the phone, Gayton testified, Parker went into their bedroom, changed clothes, and came back into the living-room area.

The ensuing events were hotly contested at trial. Gayton testified that Parker entered the living area, "grabbed my shoulders, and [] threw me into one of the tables that was next to the sofa and into the other table in the kitchen, and then he fell. He fell on top of me." She elaborated that Parker fell with her because their feet "got tangled." During the fall, Gayton added, she hit her head on either the ground or a piece of furniture, and a glass table top and several glass decorations were shattered.

---

[2] Gayton testified that Parker later admitted to her that he had hidden the card in his shoe.

This version of the incident was corroborated by evidence of contemporaneous statements made by Gayton. A patrol officer who responded to the 911 call testified that Gayton had informed him that Parker had pushed her into a table, causing her injuries. Similarly, a paramedic present at the scene recounted that Gayton had told her that "her fiancé threw her to the ground and landed on top of her." Additionally, a victim assistance coordinator testified that Gayton had stated to her that Parker had "[thrown] her into a table and pushed her into the dining area."

Parker advocated an alternative version of the incident. He emphasized a statement given by Gayton to his attorney in which she had characterized the incident as an "accident" that had occurred when she had physically blocked the apartment's front door (the sole exit) to prevent Parker from leaving. At trial, however, Gayton denied that she had blocked the door and insisted that "if [Parker] had wanted to go around [her], he had that opportunity." Gayton also explained her inconsistent statement as an attempt to prevent Parker from going to jail.[3]

Moore—the other adult roommate—testified similarly that Gayton had attempted to prevent Parker from leaving the apartment:

> Q: So she's [Gayton's] standing in front of the door, and he's [Parker's] trying to walk out. What do you see him do?
>
> A: I guess it just looks like them kind of like pushing each other back and forth. It's just them trying to move each other out of the way, like she's trying to keep him in the apartment. He's trying to leave the apartment. It's just no one is winning anything time to quit [sic].
>
> Q: Okay. And then what happened?

---

[3] The victim assistance coordinator added that Gayton had never described the incident as an "accident" or claimed that she had attempted to prevent Parker from leaving the apartment.

A.   From there, they both fall.  He lands on top of her.  She's on the floor on her back.  From there, he gets up and just runs out of the apartment.

. . .

Q:   [D]id you see Shawn [Parker] grab her and throw her in that direction or physically toss her in some way?

A:   I don't want to say throw or toss or anything.

Q:   Well, what word would you use?

A:   Trying to move, because that's how both of them were.  They weren't throwing each other.  If they wanted to throw each other, they would have thrown each other.  They were just trying to get out of each other's way.  Neither one of them wanted them to leave.  It's kind of like when you're trying to control somebody.  You don't want them to do what they want to do.  You want them to do what you want them to do.

Q:   Okay.  And from what you observed, what did Shawn want to do?

A:   He wanted to leave.  He wanted her to move, and he wanted to leave because the situation was only getting worse.

On the other hand, Moore admitted during cross-examination that she had previously made inconsistent statements, including informing the State's attorney that Parker had grabbed Gayton to move her out of the way.  Moore likewise acknowledged that she had provided a written statement to police on the night of the incident reflecting:  "Started pushing her until Shawn Parker threw Melanie Gayton into a wooden table and then onto the floor."

A third inconsistent account by Moore was revealed in an audio recording of Gayton's 911 call admitted into evidence.  On the call, Gayton recounts the events leading up to the physical confrontation to the 911 dispatcher in a manner consistent with Gayton's trial testimony.  She then can be heard stating, "Don't touch me, don't touch me, don't—," followed by what appears to be

4

the sound of a crash and children crying. Shortly thereafter, Moore can be heard informing the dispatcher, "He just pushed her to the ground. She's laying on the ground."

Moore was the sole witness to testify for the defense; Parker opted to exercise his Fifth and Fourteenth Amendment rights not to do so. At the close of evidence, Parker requested a jury instruction on the law of self-defense. Counsel argued that the instruction was supported by Moore's testimony, urging that "[t]he defendant in this case is attempting to leave his house according to the evidence that was presented through Ms. Moore. And the victim, the complainant, attempted to keep him from leaving, and that was the proximate cause of her injuries, that altercation and contact. And so we would argue that a self-defense claim would give the jury a way to effectuate that testimony that was presented." The State objected to the proposed instruction, arguing that there was no evidence tending to show that Parker had a reasonable belief that force was immediately necessary to protect himself from Gayton. The State further objected on the ground that the defense's sole theory of the case presented at trial was that the incident was an "accident." The prosecutor explained, "He would have to admit to all of the elements, including all the culpable mental states, in order to bring up that defense. . . . What the defense has been in this case [is] . . . that they just happened to fall. . . . He just says it's a complete accident, which we believe makes this case not on point as far as the instruction on self-defense." The district court refused the requested instruction.

The jury found Parker guilty as charged and assessed punishment as indicated above. The district court sentenced Parker in accordance with the jury's verdict. Subsequently, Parker filed a motion for new trial, which was denied by operation of law. This appeal followed.

5

## STANDARD OF REVIEW

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*.[4] We first determine whether error exists.[5] If error exists, we then evaluate the harm caused by the error.[6] The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only some harm.[7] By contrast, unobjected-to charge error requires reversal only if it resulted in egregious harm.[8]

## ANALYSIS

In his sole issue on appeal, Parker argues that the district court reversibly erred in refusing to instruct the jury on the law of self-defense. We disagree.

Self-defense is defined in section 9.31 of the Penal Code, which provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force."[9] Self-defense is a type of justification defense, i.e., a defense of "confession and

---

[4] 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd).

[5] *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Swearingen*, 270 S.W.3d at 808.

[6] *Ngo*, 175 S.W.3d at 743; *Swearingen*, 270 S.W.3d at 808.

[7] *Almanza*, 686 S.W.2d at 171; *Swearingen*, 270 S.W.3d at 808.

[8] *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

[9] Tex. Penal Code § 9.31(a).

avoidance."[10]  "In other words, the defendant must 'admit' violating the statute under which he is being tried, then offer a statutory justification for his otherwise criminal conduct."[11]  A defendant claiming entitlement to an instruction on a confession-and-avoidance defense "must admit to each element of the offense, including both the act and the requisite mental state."[12]  "If the defensive evidence does no more than attempt to negate an element of the offense, a defendant is not entitled to a defensive instruction on any defense that is subject to the doctrine of confession and avoidance."[13]  "Thus, a defendant is not entitled to a jury instruction on self-defense if, through his own testimony or the testimony of others, he claims that he did not perform the assaultive acts alleged, or that he did not have the requisite culpable mental state, or both."[14]

In this case, Parker was charged with intentionally, knowingly, or recklessly causing bodily injury to Gayton "by pushing or shoving [Gayton] onto a table, the floor or other object." Thus, in order for Parker to be entitled to an instruction on self-defense, he would first have to admit, through his testimony or the testimony of others, to both the assaultive acts and the culpable mental state.  He admitted to neither.  Instead, as summarized above, Parker presented evidence that the incident was an "accident" and that Gayton, rather than being pushed or shoved to the ground, had fallen to the ground.

---

[10]  *See Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

[11]  *VanBrackle v. State*, 179 S.W.3d 708, 715 (Tex. App.—Austin 2005, no pet.) (citing *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999)).

[12]  *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013).

[13]  *Id*.

[14]  *VanBrackle*, 179 S.W.3d at 715.

The defensive theory of the case was apparent from counsel's opening argument, when he explained to the jury,

> It's a simple case. We're not contesting that he was there. We're not contesting that there was an injury. . . . What we're talking about is an accident. What we're contesting is the intent, what led up to her being on the floor. What was his intent when she ended up on the floor? That's what the question is here. And that's one of the reasons why this makes this a very short case. I agree with the State on that regard. Accidents happen. They happen every day. Your job is to determine by looking at all the evidence whether or not it was, in fact, an accident. . . .
>
> They have to prove beyond a reasonable doubt that he intentionally, knowingly, or recklessly caused her injury. Accident is not intentional, accident is not knowing, and accident is not reckless. When you've heard all the evidence and you've weighed it, we believe that that's what you will determine, that this was, in fact, an accident.

Throughout trial, Parker was consistent in advocating this "accident" defense. As indicated above, Parker emphasized the statement that Gayton had made to his attorney in which she characterized the incident as an "accident." During his cross-examination of Gayton, counsel focused on portions of the statement tending to show that Gayton had fallen when Parker had "tripped" while he was trying to open the door:

> Q.   And you also told me that he went around you and tried to open the door himself, didn't he?
>
> A.   I don't remember.
>
> Q.   And do you recall telling me that as he pulled the door open and you were trying to stop him he tripped, and you both fell down and hit the table? Do you recall telling me that?
>
> A.   Yes.

Q. And that he landed on top of you when you both fell?

A. Yes.

Additionally, Parker presented the testimony of Moore, who characterized the incident at the door as "just them trying to move each other out of the way" and explained how she had witnessed them "both fall" to the ground as they moved. When asked by counsel if she saw Parker "grab [Gayton] and throw her in that direction or physically toss her in some way," Moore testified, "I don't want to say throw or toss or anything." Instead, she explained, they were "[t]rying to move, because that's how both of them were. They weren't throwing each other. If they wanted to throw each other, they would have thrown each other. They were just trying to get out of each other's way." Later in her testimony, when asked by counsel to "describe the contact that was made between the two of them," Moore testified, "The contact that was between the two of them whenever the situation happened, I don't want to say that it was intentional. I mean he didn't go up to her to hurt her and vice versa." And, when asked to characterize how Parker fell on Gayton, Moore testified, "Like he fell like he was trying to catch himself, but he fell on top of her too. They both fell together. And it just so happened to be that she hit the tile, and he landed on top of her." This testimony further suggests accidental rather than intentional conduct. Thus, through Moore's testimony and Parker's cross-examination of Gayton, Parker was denying that he had pushed or shoved Gayton to the ground as the State alleged, and he was also denying that he had the requisite mental state to commit the alleged assault. Such evidence is not in the nature of a "confession and avoidance" defense and, therefore, does not entitle Parker to an instruction on self-defense.[15]

---

[15] *See Ex parte Nailor*, 149 S.W.3d 125, 132-34 (Tex. Crim. App. 2004) (concluding that defendant "was not entitled to an instruction on self-defense" when defensive theory at trial was that

We overrule Parker's sole issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   August 29, 2014

Do Not Publish

---

injury to wife "was an accident" and "defense was more in the nature of a denial of two of the State's alleged elements, rather than an admission of those elements with a legal justification for them"); *see also Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999) ("To raise [the similar defense of] necessity,   Appellant must admit he committed the offense and then offer necessity as a justification.  Here . . .  Appellant argued he did not commit the offense because he did not have the requisite intent and he did not perform the actions the State alleged.  Appellant was therefore not entitled to a jury instruction on the defense of necessity."); *Williams v. State*, 314 S.W.3d 45, 50-51 (Tex. App.—Tyler 2010, pet. ref'd) (defendant not entitled to instruction on self-defense "because he did not admit the essential conduct along with the requisite mental state").