**Opinion issued January 9, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00599-CR

_____

**JOSE RUPERTO ALANIZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 30th District Court**
**Wichita County, Texas[1]**
**Trial Court Case No. 55,523-A**

## MEMORANDUM OPINION

A jury convicted appellant, Jose Ruperto Alaniz, of aggravated assault with a

deadly weapon, and the trial court assessed his punishment at 75 years' confinement.

---

[1]     The Texas Supreme Court transferred this appeal from the Court of Appeals for the
Second District of Texas. *See* TEX. GOV'T CODE § 73.001  (authorizing transfer of
cases between courts of appeals).

In a single issue on appeal, appellant contends the trial court erred in failing to instruct the jury on the law of self-defense. We affirm.

## BACKGROUND

### *The Stabbing*

On December 3, 2014, the complainant, Juan Johnathan Fernandez ["John"], went with some of his friends to Stage West, a bar in Wichita Falls. John ordered a drink and then sat down to visit with his friends, Joshua Reed and Jessica Holley. When John went to the bar to get another round of drinks for his friends, he saw Joshua's brother, Justin, at the bar surrounded by three men. Because the discussion between the men "didn't look . . . friendly," John leaned against the bar trying to listen to their conversation.

While doing so, appellant, who John did not know, got in John's "personal space" and asked, "what was up." John responded likewise, "What's up?" Appellant, still "in [John's] face," again asked, "What's up?" John told appellant that he was "just checking on [his] homeboy to make sure he's ok." Appellant answered, "Well, what if he's not? What the f— are you gonna do?"

John then swung and hit appellant, knocking him back. John swung again, but he was not sure if he hit appellant. John stated, "And then I went back and then he came at me and swung at me and I went to dodge back, but something—I thought he punched me in the nose." A videotape of the incident shows John backing up and

2

then appellant coming toward him and striking at him. A police officer testifying about this video noted that you could see "[John] backing up and then you saw [appellant] come toward him and start to strike him."

John felt that the amount of bleeding from him face was disproportionate to the blow he had received. He noted, "I was thinking in my head he did not punch me this hard for me to be bleeding this bad." John did not see a weapon in appellant's hand and did not know that he had been cut or stabbed.

John testified about what he did after noticing that his face was bleeding, as follows:

Q: What happens next?

A: I think about that for a split second and then I charge him, I tackle him into like some tables or something, and then I'm on top of him. And as I'm right on top of him, the bouncer picks me up and like carries me out the door.

Q: Did you ever punch him again?

A: I never got a chance to.

John testified that, after the bouncer shoved him out the door, he felt "weird," and said, "I think he stabbed me." John soon collapsed in the parking lot and was taken by ambulance to a nearby hospital. There, he was treated for "stabbings to his face, chest, and abdomen." John also suffered a collapsed lung from the chest wound and underwent facial surgery for the cuts to his face. Photographs documenting John's extensive injuries were introduced at trial.

3

Police later located appellant at his friend's house, and he was arrested. Photographs were also taken of appellant showing only a small abrasion on his lower back.

***The DNA Evidence***

The police executed a search warrant at the house where appellant was arrested and found several items of blood-stained clothing, as well as a blood-stained lock-blade knife. The police also found blood stains in the car in which appellant fled the bar.

Chelsea Wingate, a forensic scientist with the Department of Public Safety testified that she screened the evidence for the presence of blood, biological fluids, or other sources of DNA. She testified that she recovered blood from the clothes, as well as the knife. Regarding the testing of the knife, Wingate testified that it "was screened for the presence of blood as well as it was swabbed for handler DNA to determine who was holding the knife." She explained that, when she tested the handle of the knife, she tried to avoid the bloodstains so that she could get only the DNA of persons who might have handled the knife, not just of the person who may have been cut by the knife. When asked whether she was confident that she did not collect any blood when she swabbed the handle, Wingate responded, "To my best knowledge, I didn't, but I can't say for sure because sometimes blood, you know, I mean, it depends, but there could be blood that's like microscopic that I can't see."

4

Nicole Mullins, a DNA analyst with the Department of Public Safety, analyzed the samples that Wingate had taken from the evidence. The DNA taken from the hood and cuff of the denim jacket recovered when appellant was arrested was from John. Likewise, DNA on the jeans and boots recovered when appellant was arrested was from John. And, the DNA recovered from the car in which appellant fled was also from John.

Regarding the knife, Mullins tested both sides of the blade, as well as the handle. One side of the knife's blade was a DNA mixture that included appellant's DNA; John's DNA was excluded. The other side of the blade contained a DNA mixture that included appellant, John, and an unknown contributor. The handle of the knife contained a DNA mixture of four contributors; appellant, John, and two unknown contributors. Mullins testified that the majority of the DNA on the handle was contributed by John. However, when further questioned about whether there was blood in the DNA mixture that she was testing, Mullins replied:

> [I]f we take a swabbing of the knife to see who's handled it, we try to avoid the bloody areas. Sometimes, depending on how bloody it is, it's not completely possible to avoid it, but it's—so I can't say for sure that there's no blood in this mixture. So it's possible it's just skin cells and it's also possible that it's a mixture of blood and skin cells.

Mullins also stated that "from talking with Ms. Wingate when she did the original screening on this case, [the blood on the knife handle] was difficult to avoid" because "[t]here were not a lot of areas on the handle that didn't have blood."

5

Appellant's expert, Dr. Robert Benjamin, testified that he did not "disagree with any of the work that the DPS DNA experts [Wingate and Mullins] completed[.]" He testified that, in analyzing DNA, '[i]t's all the same DNA," but he noted that some biological sources were more plentiful in producing DNA. Benjamin noted that between blood and skin, one would be more likely to find more DNA in blood. Benjamin agreed that if the sample from the knife handle contained blood, despite efforts to avoid the blood, that could explain why John was the major contributor to the DNA recovered. Benjamin also stated that "there are too many factors that you could ever make—[to] say what happened here."

## SELF-DEFENSE

In his sole issue on appeal, appellant contends the trial court erred in denying his request for a jury instruction on self-defense. Specifically, appellant argues that the requested instruction was proper because (1) there was DNA evidence suggesting that the complainant, John, introduced a knife into what had been a fistfight, and (2) that, when the complainant tackled appellant, the complainant could have used his hands as deadly weapons. Appellant contends that either of these scenarios, which he claims are supported by the evidence, would have required the trial court to include an instruction on self-defense in the jury charge.

*Standard of Review and Applicable Law*

A defendant is entitled to a jury instruction on self-defense, when requested, if the issue of self-defense is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). When reviewing a trial court's decision denying a request for a self-defense instruction, we view the evidence in the light most favorable to the defendant's requested submission. *Id.* A trial court errs in denying a self-defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the elements of self-defense. *Id.*

"Deadly force" is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE § 9.01(3). Deadly force is justified in self-defense only in response to "the other's use or attempted use of unlawful deadly force," or "to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *See* TEX. PENAL CODE § 9.32(a)(2)(A), (B); *see also Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd) (deadly force not justified in response to non-deadly force); *Diaz v. State*, No. 01-15-00646-CR, 2016 WL 6111035, at *2 (Tex. App.—Houston [1st Dist.] Oct. 20, 2016, no pet.) (mem. op., not designated for

7

publication) (defendant who used deadly force against complainant could claim self-defense only upon showing complainant "used or attempted to use unlawful deadly force, or that he was about to commit one of the offenses that justify deadly force to prevent their commission").

A defendant is not required to testify in order to raise the issue of self-defense; the issue "may be raised by the testimony of witnesses who testify to the defendant's acts and words at the time of the offense." *Reed v. State*, 703 S.W.2d 380, 384–85 (Tex. App.—Dallas 1986, pet. ref'd) (citing *Smith v. State*, 676 S.W.2d 584, 587 (Tex. Crim. App. 1984)); *see also VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.) ("Defensive issues may be raised by the testimony of any witnesses, even those called by the State."). But when, as here, a defendant does not testify, there still must be some evidence of the defendant's subjective belief that deadly force was immediately necessary to protect himself. *See Smith*, 676 S.W.2d at 585 ("[T]o justify the submission of a charge to the jury on the issue of self-defense, there must be some evidence in the record to show that the defendant was in some apprehension or fear of being the recipient of the unlawful use of force from the complainant."); *Lavern v. State*, 48 S.W.3d 356, 360 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("While a non-testifying defendant may be entitled to a charge on self-defense, it is rare for the defense to be raised when the defendant fails to testify.").

The record must contain some evidence or "observable manifestations" of the defendant's state of mind at the time of the alleged act of self-defense. *See VanBrackle*, 179 S.W.3d at 713 (quoting *Reed*, 703 S.W.2d at 385). Examples of observable manifestations of a defendant's state of mind include evidence that the defendant called for help during an altercation or told the complainant, "I don't want to fight you . . . . leave me alone," as they struggled. *VanBrackle*, 179 S.W.3d at 714; *Smith*, 676 S.W.2d at 586.

*Analysis*

Appellant first argues that, because the DNA evidence shows that the complainant's DNA was the predominant DNA on the knife handle, "[i]t is a reasonable inference from the evidence that [John] took the knife out while mounted on Appellant and tried to use it." The State responds that the presence of John's DNA on the handle of the knife is not evidence or an "observable manifestation" of appellant's state of mind. We agree with the State.

The presence of John's DNA on the handle of the knife, even if he is the major contributor of the DNA, is not evidence of appellant's state of mind, i.e., that appellant reasonably believed that stabbing John was immediately necessary to protect himself from deadly force. *See*, *e.g.*, *Morin v. State*, No. 14-17-00080-CR, 2018 WL 3625290, at *2 (Tex. App.—Houston [14th Dist.] July 31, 2018, no pet.) (mem. op., not designated for publication) (testimony that complainant had been

9

"wielding around a very large knife" not evidence of defendant's subjective intent, where there was "no evidence that the [complainant] made any threats" against him); *Alexander v. State*, No. 03-14-00290-CR, 2016 WL 286385, at \*4 (Tex. App.—Austin Jan. 21, 2016, pet. ref'd) (mem. op., not designated for publication) (evidence that complainant "was 'very angry' and 'upset' during the altercation" and that she bit defendant's arm, cut his lip, punched him, and caused him to bleed did not "establish anything regarding [defendant]'s state of mind during the altercation"); *Campbell v. State*, No. 09-02-00054-CR, 2003 WL 21034610, at \*2 (Tex. App.—Beaumont May 7, 2003, pet. ref'd) (not designated for publication) (testimony showing "violent nature of the victim and his heavy drinking habits" was "absolutely no evidence as to the state of mind of [defendant] when he stabbed the victim"); *cf. Smith*, 676 S.W.2d at 586 (defendant's statement that he did not want to fight was evidence of his state of mind); *VanBrackle*, 179 S.W.3d at 714 (cry for help was an "observable manifestation" of defendant's state of mind).

Appellant's position on appeal rests on his assertion that John had more "touch DNA" on the handle of the knife, and that "[i]t is a reasonable inference from the evidence that he took the knife out while mounted on Appellant and tried to use it." To evaluate this claim, we first consider whether appellant's assertion that John wielded the knife is a "reasonable inference."

10

In *Cavazos v. State*, the defendant, like appellant here, did not provide any direct evidence of his state of mind. Nos. 04-11-00366-CR & 04-11-00367-CR, 2012 WL 848159, at *1 (Tex. App.—San Antonio Mar. 14, 2012, pet. ref'd) (mem. op., not designated for publication). Instead, he argued that self-defense was raised because the scientific evidence showed that the victims had gunshot residue on their hands. *Id.* at 2. The defendant argued that the gunshot-residue evidence was sufficient to support a rational inference that the victims had fired weapons at him. *Id.* Even though the firing of a weapon was one possible explanation of the gunshot residue, the court noted that there was another "equally plausible" explanation, *i.e.*, that the victims were near someone who had fired a weapon. *Id.* Without "other facts" in the record supporting appellant's explanation, there was no "rational inference" that the victims fired weapons but was "mere speculation," "theorizing or guessing about the possible meaning of facts and evidence presented." *Id.*

We do not agree that appellant's theory—that John introduced a knife to a fistfight—is a rational inference from the evidence. As all the experts agreed, there is no difference in the DNA produced by blood or skin; as Dr. Benjamin noted, '[i]t's all the same DNA." While Wingate tried to avoid obtaining DNA from John's blood on the knife handle so that she could try to determine who held the knife, all the experts agreed that, blood in the sample would result in the victim's DNA being more heavily present. And, Mullins noted, "There were not a lot of areas on the

11

handle that didn't have blood." Appellant's own expert, Benjamin, stated, "[T]here are too many factors that you could ever make—[to] say what happened here."

The rational inference appellant wants the Court to make, i.e., that John pulled the knife on appellant, is simply not supported by the mere presence of his DNA on the knife handle. No evidence showed that John handled a knife and appellant suffered no injuries other than a small abrasion on his back. Appellant's conclusion that John pulled the knife because his DNA was on the knife handle is not a "rational inference" based on the evidence but is "mere speculation." *See id.*; *see also Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007) (distinguishing between "rational inferences" and "mere speculation"). As such, we conclude that the DNA evidence relied on by appellant does not provide the necessary state-of-mind evidence required to obtain a self-defense charge. *See Cavazos*, 2012 WL 848159, at *3.

Appellant also argues that, when John tackled him and was positioned on top of him before being forcibly removed by the bouncer, "[h]e could have easily caused a serious bodily injury or impairment including beating him to death by striking [appellant] with his fists." This evidence does not require a self-defense instruction for two reasons: First, as discussed above, there is no evidence in the record of appellant's state of mind i.e., that appellant reasonably believed that stabbing John was immediately necessary to protect himself from John's unlawful use of deadly force. *See*, *e.g.*, *Morin*, 2018 WL 3625290, at *2; *Alexander*, 2016 WL 286385, at

12

*4; *Campbell*, 2003 WL 21034610, at *2. Second, there is no evidence that John ever used or attempted to use his fists as a deadly weapon after tackling appellant and getting on top of him. When asked whether he hit appellant after he tackled him, John replied, "I never got a chance to." This testimony is undisputed and does not raise an issue of fact regarding whether appellant was entitled to a charge on self-defense.

For these reasons, we overrule appellant's sole issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).

13