**FILED**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI - EDINBURG

**06/11/15**

**CECILE FOY GSANGER, CLERK**
BY Delia S. Rodriguez

ACCEPTED
13-14-00038-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
6/11/2015 9:13:45 AM
CECILE FOY GSANGER
CLERK

No. 13-14-00038-CR

**IN THE
COURT OF APPEALS FOR THE
THIRTEENTH SUPREME JUDICIAL DISTRICT
SITTING AT CORPUS CHRISTI, TEXAS**

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
6/11/2015 9:13:45 AM
CECILE FOY GSANGER
Clerk

_____

ALLAN LATOI STORY,

*APPELLANT*

V.

THE STATE OF TEXAS

_____

AN APPEAL OF A CONVICTION FOR
MURDER
CAUSE NO. 2011-2499-C1
FROM THE 19TH JUDICIAL DISTRICT COURT OF
MCLENNAN COUNTY, TEXAS

_____

**STATE'S AMENDED BRIEF**

_____

ABELINO "ABEL" REYNA
Criminal District Attorney
McLennan County, Texas

STERLING HARMON
Appellate Division Chief
State Bar No. 09019700

219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
sterling.harmon@co.mclennan.tx.us

i

## Identity of Parties and Counsel

**Appellant**                               Allan Latoi Story

**Appellant's Attorney on Appeal**          Mr. Doyle L. Young
                                            P.O. Box 2174
                                            Waco, Texas 76703

**Appellant's Trial Attorney**              Mr. Sam Martinez
                                            1105 Wooded Acres, Suite 200
                                            Waco, Texas 76710

**State's Trial Attorneys**                 Mr. J.R. Vicha
                                            Mr. Chris Bullajian
                                            Assistant Criminal District
                                            Attorneys
                                            219 North 6th Street, Suite 200
                                            Waco, Texas 76701

**State's Attorney on Appeal**              Abelino 'Abel' Reyna
                                            Criminal District Attorney
                                            Sterling Harmon
                                            Appellate Division Chief
                                            219 North 6th Street, Suite 200
                                            Waco, Texas 76701

# Table of Contents

## Table of Contents

Identity of Parties and Counsel..........................................................................ii

Table of Contents ...............................................................................................iii

TABLE OF AUTHORITIES...............................................................................iv

Issue Presented ....................................................................................................1

Statement of Facts ...............................................................................................1

Summary of Argument ......................................................................................13

Argument .............................................................................................................13

    Hearsay Statement of Appellant ………………………………………… 13

    Self-Defense Instruction ………………………………………………… 18

Prayer ………………………………………………….......... 21

Certificate of Compliance ................................................................................21

Certificate of Service ........................................................................................22

# TABLE OF AUTHORITIES

**Texas State Opinions**

*Allridge v. State*, 762 S.W.2d 146 (Tex. Crim. App. 1988) ......................... 15, 16

*Crane v. State*, 786 S.W.2d 338 (Tex. Crim. App. 1990) ................................... 15

*Dinkins v. State*, 894 S.W.2d 330 (Tex. Crim. App. 1995) ......................... 17, 18

*Falade v. State, 2011 Tex. App. LEXIS* (Tex. App.– Fort Worth 2011)
  (*unpub. op.*). ……..................................................................................... 18

*Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992) ................................... 15

*Granger v. State*, 3 S.W. 3d 36, 38 (Tex. Crim. App. 1999)   …   19, 20

*Hafdahl v. State*, 805 S.W.2d 396 (Tex. Crim. App. 1990) .............................. 15

*Harris v. State*, 152 S.W.3d 786 (Tex. App.—Houston [1st Dist.] 2004) ....... 14

*Hooper v. Chittaluru*, 222 S.W.3d 103 (Tex. App.—Houston [14th
   Dist.] 2006) ...................................................................................... 14

*Johnson v. State*, 698 S.W.2d 154 (Tex. Crim. App. 1985) .............................. 13

*Jones v. State*, 843 S.W.2d 487 (Tex. Crim. App. 1992) ................................... 17

*Kirsch v. State*, 357 S.W. 3d 645 (Tex. Crim. App. 2012)  ………………….. 18

*McDonald v. State*, 179 S.W.3d 571 (Tex. Crim. App. 2005) ..................... 13, 17

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) ................. 13, 14

*Ngo v. State*, 175 S.W. 3d 738 (Tex. Crim. App. 2005)  ……………………. 18

*Nored v. State*, 875 S.W.2d 392 (Tex. App.—Dallas 1993) .............................. 14

*Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35 (Tex. 1998) ........... 14

*Romero v. State*, 800 S.W.2d 539 (Tex. Crim. App. 1990) ............................... 14

*Sauceda v. State*, 129 S.W.3d 116 (Tex. Crim. App. 2004) ......................... 14, 16

*Shaw v. State*, 243 S.W 3d 647 (Tex. Crim. App. 2007)  ……………….…..... 19

*Singletary v. State*, 509 S.W.2d 572 (Tex. Crim. App. 1974) ...................... 14, 16

*Theus v. State*, 845 S.W.2d 874 (Tex. Crim. App. 1992) .................................. 14

*Walters v. State*, 247 S.W.3d 204 (Tex. Crim. App. 2007) .......................... 14, 18

*Van Bruckle v. State*, 179 S.W. 3d 708
    (Tex. App. – Austin 2005, *no pet.*) …………………………………… 19

*Villa v. State*, 417 S.W. 3d 455 (Tex. Crim. App. 2013 …………………… 19

*Young v. State*, 991 S.W. 2d 835 (Tex. Crim. App. 1999) ………………… 19

## Statutes

*Tex. Code Crim. Proc.* art. 36.14 …………………………………….. 18

*Tex. Penal Code* §9.31 …………………………………………………. 11, 19

*Tex. Penal Code* §19.02 …………………………………………………… 1

## Rules

*Tex. R. App. P. 9.4(e)* ....................................................................... 21

*Tex. R. App. P. 9.4(i)* ....................................................................... 21

*Tex. R. App. P. 9.4(i)(1)* .................................................................. 21

*Tex. R. Evid.* 107 ................................................................. 5, 15, 16

*Tex. R. Evid.* 613 …………………………………………………… 17

*Tex. R. Evid.* 803(24) ....................................................................... 18

**Issues Presented**

*Appellant's Issue One*:

Did the trial court err in excluding from evidence an electronic recording of an interview of Appellant by a police officer, that was made three to four hours after the stabbing of the victim?

*Appellant's Issue Two:*

Did the trial court err in refusing Appellant's requested jury instruction on self-defense?

**Statement of Facts**

Appellant was indicted on December 9, 2011 for the First Degree felony offense of Murder, *Tex. Penal Code* §19.02. (CR I –7). Jury trial was held on December 10-12, 2013 in the 19th Judicial District Court of McLennan County, Texas, before the Honorable Ralph T. Strother.

The State called six witnesses in its case in chief. Wanda Kendrick testified that she was a long-time acquaintance of the victim, Zachary Davis, and his sister, Rene Davis. (RR III – 15). She also knew the Appellant through his relationship with Rene Davis. (RR III – 16). At the time of the murder, however, she only knew Appellant by the name of "T." (RR III – 16). Kendrick had lived with Rene and Appellant for about a month, prior to the murder. (RR III – 16). Kendrick described Appellant as being "controlling" in his relationship with Rene, and described Rene as "kind of slow," and easily manipulated. (RR III – 17).

1

On the night of September 22, 2011, Kendrick went to Rene and Appellant's apartment. (RR III – 17). While walking to the apartment, Kendrick saw Zachary Davis running out the gate of the apartment. (RR III – 18). Kendrick could see that Zachary was bleeding. (RR III – 18). Shortly thereafter, Zachary collapsed in front of another apartment and kept repeating, "T," referring to Appellant. (RR III – 19). Kendrick tried talking to Zachary, trying to "keep him alive until the ambulance got there," but after about five minutes, Zachary "looked up and took his last breath." (RR III – 20).

The State's second witness was Venson Scott, the father of Rene and Zachary Davis. (RR III – 23-24). Mr. Scott knew Appellant before the murder only by the name of "T." (RR III – 24). About two months prior to the murder, Mr. Scott had let Appellant borrow a hunting knife. (RR III – 25). This knife had a blade of approximately four to five inches. (RR III – 26). Mr. Scott never got the knife back, and at the time of his testimony, did not know where it had gone to. (RR III – 26).

The State's third witness was Joyce Akers. Ms. Akers was a friend of Zachary and Rene Davis from childhood. (RR III – 29). She also knew Appellant through his relationship with Rene Davis. (RR III – 30-31). Prior to the murder, Ms. Akers knew Appellant only as "Memphis." (RR III – 30).

On the day of the murder, Ms. Akers went to visit Rene at the apartment she shared with Appellant. (RR III – 33). Zachary was also

2

present at the apartment.  (RR III – 33).  Rene and Appellant were arguing, and Appellant told Rene that if she kept arguing, he was going to "put his hands on her."  (RR III – 34).  At that point, Zachary told Appellant that as long as Zachary was there, Appellant was not going to put his hands on Rene.  (RR III – 35).  Appellant then told Zachary that if he interfered in his conflict with Rene, that Appellant would kill him.  (RR III – 35).

After this exchange, Appellant went into a back room by himself and returned a few moments later.  (RR III – 35).  When Appellant returned to the living area, Zachary told him, "Whatever you went back there to get or whatever you call yourself doing, you're going to have to use it. " (RR III – 36).  Appellant then started to leave through the back door of the apartment.  (RR III -- 36).  As Appellant was attempting to leave, Rene was "right there on his back, started yakking at him, fussing at him."  (RR III – 36).  Appellant turned on Rene, grabbing her by the throat and pushing her against the wall.  (RR III – 36-37).  Zachary then told Appellant, "I told you not to put your hands on my sister," and the two men started fighting on the back porch.  (RR III – 37).  Rene joined in, hitting Appellant as well.  (RR III – 37).  Appellant fell to the ground, and the fighting stopped.  (RR III – 37-38).

After the fighting stopped, Zachary walked over to the yard area, away from Appellant, while Rene stood off to the side.  (RR III – 38).  Appellant walked over to the back door, where a knife fell from his person.  (RR III – 38).  Appellant then approached Zachary with the knife.  (RR III –

38).  Ms. Akers saw Zachary fall back, with Appellant on top of him, stabbing him.  (RR III – 38-39).  Ms. Akers estimated that Appellant stabbed Zachary four or five times.  (RR III – 39).  While this was going on, Ms. Akers pleaded with Appellant to "please stop stabbing him."  (RR III – 39).  Meanwhile, Rene was looking around, trying to find something with which to hit Appellant.  (RR III – 39).  Unable to find anything, Rene ran inside the apartment and returned with a hammer.  (RR III – 39).

When Rene returned, Appellant got up off of Zachary and went inside the apartment, locking the door behind him.  (RR III – 40).  Zachary got off the ground, "like Superman," and ran off.  (RR III – 40).  Ms. Akers testified that Rene did not strike Appellant with the hammer, and that no weapons other than Appellant's knife were present during the attack.  (RR III – 40).  Ms. Akers clarified that the initial altercation between Zachary and Appellant was a fistfight, with no weapons being present or used.  (RR III – 40-41).

The fourth State's witness was Waco Police Officer Jason Ireland.  A patrol officer, Ireland was dispatched to the scene of the stabbing the night of September 11, 2011.  (RR III – 60).  On arrival, Officer Ireland found two other officers administering first aid to Zachary Davis.  (RR III – 61).  Mr. Davis was gasping for breath and there appeared to be a stab wound to his abdomen.  (RR III – 62).  Zachary Davis died a few minutes after officer Ireland's arrival.  (RR III – 62).

The initial investigation at the scene revealed Appellant as the suspect in the stabbing, and also led to the discovery of Appellant's cell phone number. (RR III – 63). Using GPS, investigators were able to determine a location for Appellant's cell phone at a nearby address. (RR III – 64). After searching for three to four hours, Appellant was found inside a residence. (RR III – 66). Appellant did not voluntarily surrender to officers at first. (RR III – 66). Only when he was advised that a canine unit would be used, did Appellant agree to surrender. (RR III – 67). Appellant had no apparent injuries at the time of arrest, nor did he complain of such or request any medical treatment. (RR III – 67-68).

At a bench conference after Officer Ireland's direct testimony, Appellant moved to admit into evidence a recorded interview between Appellant and Officer Ireland. (RR III – 68). This recording had been made shortly after arrest, while Appellant was seated in the back of Ireland's patrol vehicle. (RR III – 69). Appellant argued that the recording was admissible under *Tex. R. Evid.* 107, the Rule of Optional Completeness. (RR III – 69). The State responded that the recording was hearsay, and would circumvent the requirement of direct testimony by Appellant. (RR III – 69). After argument by counsel, the Court sustained the State's hearsay objection. (RR III – 70). Appellant then made an offer of proof, admitting a copy of the recording as Defense Exhibit 1 for the purpose of record. (RR III – 72). The State further objected to the recording's relevance, which was also sustained. (RR III – 75).

5

The State then called Angelika McCallister, a Crime Scene Technician for the Waco Police Department.  (RR III – 87).  Ms. McCallister sponsored the State's photographic and documentary evidence from the crime scene, and the parties involved in the stabbing.  Referring to photos of Appellant taken shortly after arrest, Ms. McCallister testified that he had a number of superficial and non-life threatening injuries.  (RR III – 102-105).  On cross-examination, Ms. McCallister testified that she had also taken photos of Rene Davis, but she did not observe any injuries to her person.  (RR III – 105).

The State's final witness was Dr. Janice Townsend-Parchman, who performed Zachary Davis' autopsy.  Mr. Davis suffered three stab wounds.  (RR IV – 12).  The first stab wound was to Zachary's front left shoulder.  (RR IV – 14).  It penetrated 4 ¾ inches, perforating the left subclavian vein and left lung.  (RR IV – 15-16).  The second also penetrated to a depth of 4 ¾ inches, into Zachary's liver (RR IV – 18-19).  The third stab wound penetrated three inches into the subcutaneous tissue of Zachary's right thigh.  (RR IV – 20).  Toxicology results showed the presence of low levels of over-the-counter antihistamine and THC.  (RR IV—22-23).  The only other injury observed was a scrape on the right knee.  (RR IV—24).  In Dr. Townsend-Parchman's opinion, Zachary Davis' death was caused by the three stab wounds.  (RR IV—24).

Appellant's first witness was Rene Davis.  She testified that Appellant lived with her, although she did not then know him by his true name.  (RR

IV – 30).  On the night of the murder, she, Appellant, Zachary and Joyce were at Rene's apartment.  (RR IV – 31).  An argument took place inside the apartment, and then Rene and Zachary went outside.  (RR IV – 31).  Appellant followed them outside, where the argument continued.  (RR IV – 32).  Rene denied that any physical contact occurred between her and Appellant.  (RR IV – 32).  According to Rene, Zachary started the fight when he punched Appellant.  (RR IV – 33).  Zachary threw the first punch because it appeared that Appellant was about to assault Rene.  (RR IV – 33).  Rene's specific testimony was "I know he punched him first because he was acting like he was going to come do something to me."  (RR VI – 33).  The situation then became a physical fight with Zachary and Rene on one side and Appellant on the other.  (RR IV – 34).  The altercation devolved to the point where Appellant ended up on the ground.  (RR IV – 34).  Rene claimed that during the fight she was hitting Appellant with a stick.  (RR IV – 34).  Rene said that the fighting continued between Zachary and Appellant uninterrupted, while she went inside to get a hammer.  (RR IV—36).  Rene believed that when she came back outside, she hit Appellant with the hammer.  (RR IV – 36).  At some point, Rene saw something shiny which she took to be a knife.  (RR IV – 35).  Shortly after Rene got the hammer, the fight stopped because Zachary was bleeding.  (RR IV – 36).  She and Zachary let Appellant up at that point and Appellant ran inside the apartment and locked the door.  (RR IV – 36).  Zachary ran out the back yard toward the parking lot, while Rene called the police.  (RR IV – 37).

7

On cross-examination, Rene testified that Appellant was from Tennessee and she had met him over the internet. (RR IV – 38). She said she fell in love with Appellant and invited him to come live with her. (RR IV – 39). At that time, Rene knew Appellant by the name of William Harris. (RR IV – 39). On the night of the murder, Rene gave a statement to the police. (RR IV – 41). Rene explained that she had not mentioned anything that night about a stick or a hammer because she was scared. (RR IV – 43). Rene also recalled visiting Appellant at the jail. (RR IV – 44). The State's counsel questioned Rene regarding specifics of her conversations with Appellant during the jail visits. Rene told Appellant she loved him and wanted to be with him, and Appellant asked her to marry him. (RR IV – 44). Appellant told Rene they could be together, but she needed to help him out of the situation he was in. (RR IV – 45). Appellant told Rene what the truth needed to be was that he was acting in self-defense, and that if she told the truth, "I can get out of here on a self-defense claim." (RR IV – 46). Rene agreed that Appellant was trying to manipulate her. (RR IV – 49). Rene also testified that she reported the use of the stick and the hammer only after meeting with Appellant at the jail. (RR – 50-51). However, Rene still held the opinion that Zachary had punched Appellant in order to protect her. (RR IV – 68).

Appellant then called his defense investigator, Edward McElyea, who testified that Rene Davis had given him a hammer from her apartment on March 7, 2012. (RR IV – 69-70).

Appellant then called Steve January on voir dire, regarding the State's Motion in Limine on statements made by Appellant. (CR I – 110). Mr. January was a Waco Police Officer at the time of the offense, and had subsequently become an investigator for the Criminal District Attorney's Office. (RR IV -- 75, 80). Mr. January addressed his role in the murder investigation generally, and advised specifically that he had interviewed Appellant the night of the murder. (RR IV – 78). Upon completion of the voir dire examination, Appellant's counsel advised the court that he intended to question Mr. January regarding his role in the investigation, including the fact that he had interviewed Appellant. (RR IV – 82). The State's counsel objected to anything beyond the fact of the interview, including such details as what was said in the interview, the length of the interview, or whether or not the interview was recorded, as those matters were not relevant. (RR IV – 82). The court expressed agreement with the State's position, whereupon Appellant's counsel advised the court that he did not intend to explore those specific details. (RR IV – 82-83). The Court admonished Appellant's counsel of the limitations imposed regarding Mr. January's testimony, whereupon Appellant's counsel reiterated his position that Appellant's prior out-of-court statements were relevant to the issue of impeachment. (RR IV – 83).

Mr. January then testified before the jury. Describing his role generally in the investigation of the murder, January's testimony did not touch on any interview he had conducted with Appellant. (RR IV – 85-91).

Appellant then rested. (RR IV – 91). The court then allowed Appellant additional voir dire of Mr. January, for the purpose of developing the record. (RR IV – 93). In this second voir dire, January testified that he interviewed Appellant on the night of the murder. (RR IV – 93). During the initial investigation, January developed no evidence to indicate that Appellant had acted in self-defense. (RR IV – 93-94). On further questioning, January clarified that the issue of self-defense did arise during his interview with Appellant. (RR IV – 94).

On completion of the voir dire examination, the court asked Appellant's counsel for clarification of Appellant's grounds for admissibility of the interview with Mr. January. (RR IV – 96). Advised that the information went to impeachment, the court inquired, "Impeachment of whom?" (RR IV – 96). Appellant's counsel referred to the cross-examination testimony of Rene Davis and the implication that self-defense was a recent fabrication between her and Appellant. (RR IV – 96). The court then brought up the recording of the interview between Appellant and Jason Ireland. (RR IV – 96). Appellant's counsel reiterated the position that that recording rebutted the impression that Appellant had been uncooperative with law enforcement. (RR IV – 96). The court denied the admission of Appellant's prior out-of-court statements, ruling that they were hearsay. (RR IV – 97).

After the parties rested, a bench conference was held wherein the issue of self-defense was discussed. (RR IV 104-123). The court asked

10

Appellant's counsel, "what evidence has actually raised your client having the right to use deadly force against the victim in this case? (RR IV – 104). Appellant's counsel referred to Rene Davis' testimony that she had hit Appellant with a stick. (RR IV – 105). The State reminded the court of the provocation provisions of *Tex. Penal Code* §9.31. (RR IV – 106-106). The court advised the parties that the self-defense instruction would be given, but instruction on multiple assailants and provocation would also need to be submitted. (RR IV – 107-108).

After a lunch break, the court expressed concerns about the propriety of a self-defense instruction. (RR IV – 108). The court pointed out that before a self-defense instruction could be given, there had to be evidence that unlawful deadly force was being used against the defendant and that he reasonably believed that he had to use deadly force to protect himself from the unlawful use of deadly force. (RR IV – 109). The court conceded the point that Rene Davis had testified "that she had a stick or a club and that later she went in and got a hammer." However, the court did not see how this raised the issue that Appellant reasonably believed that he had to use deadly force to protect himself from deadly force. (RR IV – 109). The court rejected the "bootstrapping" argument that, since the Appellant had used deadly force, he must have believed it was necessary. (RR IV – 112). The court pointed out that Joyce Akers testified that the victim hit Appellant when Appellant started choking Rene. Rene testified that the victim hit Appellant when Appellant was about to put his hands on Rene.

11

(RR IV – 117).  The State's counsel argued that under either version of events, the victim was justified in acting to defend his sister, and therefore Appellant's reaction was not a lawful use of force.  (RR IV – 118-119, 122-123).  For these reasons, the court denied the self-defense instruction.  (RR IV – 123).

Upon the completion of the evidence, the jury was charged and final arguments presented.  The jury returned a verdict of "guilty."  (RR IV – 163).  At the completion of the punishment phase, the jury found the enhancement allegations to be true and assessed punishment at life in prison.  (RR VI – 64).

## Summary of Argument

*Appellant's Issue One*:

The trial court did not err in excluding as hearsay an electronic recording of an interview of Appellant by a police officer, that was made three to four hours after the stabbing of the victim.

*Appellant's Issue Two:*

The trial court did not err in refusing Appellant's requested jury instruction on self-defense, as such an instruction was not supported by the evidence.

## Argument

### Hearsay Statement of Appellant

The trial court did not abuse its discretion in excluding Appellant's recorded statement as inadmissible hearsay. Because the trial court did not abuse its discretion, Appellant's sole point should be denied.

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). When evidence is excluded, the burden is on the proponent of the evidence to show that the court abused its discretion. *Johnson v. State*, 698 S.W.2d 154, 160 (Tex. Crim. App. 1985). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding principles. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). An abuse of discretion does not occur merely

because the appellate court would have decided a discretionary matter in a different way than the trial court. *Id.*

A trial court must be given wide latitude in its decision to admit or exclude evidence. *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992). As long as the trial court's evidentiary ruling is at least within the zone of reasonable disagreement, an appellate court may not disturb it. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). There should be "reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery* at 378; *Harris v. State*, 152 S.W.3d 786, 793 (Tex. App.—Houston [1st Dist.] 2004).

An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for doing so. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006). An appellate court must uphold the trial court's ruling if it can be upheld on any valid theory, regardless of whether the theory was argued in the trial court or on appeal. *Nored v. State*, 875 S.W.2d 392, 395 (Tex. App.—Dallas 1993). This principle is especially countenanced with regard to the admission of evidence, and even holds true where the trial judge gave an improper reason for the ruling. *Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990).

The Court of Criminal Appeals has noted that "every rule of evidence works a hardship on some litigants part of the time, and it is easy to sympathize with the frustration of any party whose most promising

strategy turns out to be objectionable under the law." *Fuller v. State*, 829 S.W.2d 191, 207 (Tex. Crim. App. 1992). Nevertheless, the court held that it is "not at liberty to relieve every such disappointment with an ad hoc suspension of the Rules." *Id.*

Defense Exhibit 1 is the audiovisual recording of Appellant's conversation with Waco Police Officer Jason Ireland. At trial, Appellant moved for admission of this evidence under the rule of Optional Completeness, *Tex. R. Evid.* 107, and under the theory of impeachment. The trial court denied admission of the evidence finding it to be hearsay, and not relevant.

It is the rule in Texas that self-serving declarations are hearsay and not admissible in evidence as proof of the matters asserted. *Hafdahl v. State*, 805 S.W.2d 396, 402 (Tex. Crim. App. 1990), *cert. denied*, 500 U.S. 948, 111 S. Ct. 2250, 114 L. Ed. 2d 491 (1991); *Crane v. State*, 786 S.W.2d 338, 353-54 (Tex. Crim. App. 1990); *Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988), *cert. denied*, 489 U.S. 1040, 109 S. Ct. 1176, 103 L. Ed. 2d 238 (1989).

There are exceptions to the rule against the admission of self-serving hearsay declarations. Appellant urges that an exception be recognized in the instant case under the theory of Optional Completeness or Impeachment.

The Rule of Optional Completeness, *Tex. R. Evid.* 107, provides that when part of an act, declaration, conversation, writing or recorded statement is given in evidence by a party, the other party may inquire into

the whole on the same subject, and any other act, declaration, writing or recorded statement which is necessary to provide a full understanding or explanation of the topic. Admission of an accused's self-serving declaration must come under some exception to the hearsay rule, such as being part of a *res gestae* statement, being part of a statement already proved by the State, or being necessary to explain or contradict acts or declarations first offered by the State. *Singletary v. State*, 509 S.W.2d 572, 576 (Tex. Crim. App. 1974); *Allridge* at 152. Admissibility under *Rule* 107 requires that the statement be on the same subject of inquiry and necessary for a full understanding of the topic. *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004). Appellant urged the admission of the recording at the conclusion of Officer Ireland's testimony. The record shows that Officer Ireland did not in any way refer to his conversation with Appellant or any statements made by Appellant. There being no inquiry by the State into any statement by Appellant, the condition precedent to admitting the "whole" of such a statement by the Appellant was never satisfied. As no partial statement of Appellant had been offered or admitted, there was no basis for entering optional completeness evidence, nor was such evidence needed for a full understanding of the topic.

After the examinations of Steve January, Appellant proposed "impeachment" as a basis for admitting the Appellant's recorded statement. (RR III – 96). The trial court was compelled to ask, "Impeachment of whom?" (RR III – 96). Appellant's counsel made

16

reference to the cross-examination of Rene Davis and the implication that Appellant's claim of self-defense was a recent fabrication, and the testimony of Officer Ireland and the implication that Appellant had not been cooperative with law enforcement. (RR III – 96). While witnesses may be impeached by their own prior inconsistent statements, *Tex. R. Evid.* 613, Appellant made no showing as to how his own previously recorded statement could constitute impeachment of Rene Davis or Officer Ireland. On such a tenuous showing for admissibility, it cannot be shown that the trial court's denial fell outside the zone of reasonable disagreement, or constituted an abuse of discretion. *McDonald* at 576.

Appellant cites to two cases in support of admission of his recorded statement, *Dinkins v. State*, 894 S.W.2d 330 (Tex. Crim. App. 1995); and *Jones v. State*, 843 S.W.2d 487 (Tex. Crim. App. 1992). These cases stand for the proposition that certain out-of-court statements may be admitted if not offered as proof of the matter asserted. In those cases, otherwise hearsay statements were properly admitted to show how law enforcement came to suspect the defendant of having committed a crime.

These cases are inapt to an analysis of Appellant's self-serving declaration in the instant case. There is no suggestion that the fact of Appellant's recorded statement was what led to his being a suspect in Zachary Davis' murder. If such had been the case, the State itself would have offered the statement as a statement against Appellant's penal interest. *Tex. R. Evid*. 803(24). As has already been addressed, the proposed

17

bases for admissibility proffered by the Appellant at trial are also inapplicable. The Court should note however that on those bases, admissibility would be predicated on a hearsay exception bearing indicia of truthfulness. Stating the matter more simply, optional completeness and impeachment evidence are admissible for the very reason that they are offered to get at the truth.

Appellant's recorded interview is simply a classic self-serving hearsay statement and the trial court correctly excluded its admission. *See, Falade v. State, 2011 Tex. App. LEXIS* 9408 (Tex. App.– Fort Worth 2011) (*unpub. op.).* Appellant's first point of error should be denied.

**Self-Defense Instruction**

Appellant complains that the trial court erred in denying his requested jury charge on self-defense. Review of alleged jury charge error is a two-step process. First, it must be determined whether error exists; if so, the error must be evaluated to determine whether sufficient harm has resulted so as to require reversal. *Kirsch v. State*, 357 S.W. 3d 645, 649 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W. 3d 738, 743-744 (Tex. Crim. App. 2005). The trial court must charge the jury on the law applicable to the case, which requires that the jury be instructed on every element of the offense charged. *Tex. Code Crim. Proc.* art. 36.14; *Dinkins* at 339. The trial court is further required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence and requested by the defendant. *Walters* at 208-209.

Self-defense is defined in *Tex. Penal Code* §9.31, which provides that a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. Self-defense is a type of justification defense; that is, a defense of "confession and avoidance." *Shaw v. State*, 243 S.W 3d 647, 659 (Tex. Crim. App. 2007). To avail himself of the defense, the accused must 'admit' the violation and offer a statutory justification for his otherwise criminal conduct. *Young v. State*, 991 S.W. 2d 835, 838 (Tex. Crim. App. 1999); *Van Bruckle v. State*, 179 S.W. 3d 708, 715 (Tex. App. – Austin 2005, *no pet.*). To merit instruction on a confession-and-avoidance defense, the defendant must admit to each element of the offense, including both the act and the requisite mental state. *Villa v. State*, 417 S.W. 3d 455, 462 (Tex. Crim. App. 2013). If the defensive evidence does no more than attempt to negate an element of the offense, the defendant is not entitled to the defensive instruction. *Id*. A defendant is not entitled to a defensive instruction if, through his own testimony or the testimony of others, he claims that he did not perform the act alleged, or that he did not have the requisite mental state, or both. *Van Bruckle* at 715.

A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of the trial court's opinion about the credibility of the defense. *Granger v. State,* 3 S.W. 3d 36, 38 (Tex. Crim.

App. 1999). In deciding whether a defensive issue is raised, the evidence is viewed in the light most favorable to the defense. *Id*.

Two witness accounts were given at the trial of the instant case, those of Rene Davis and Joyce Akers. Rene Davis' account would appear to be most favorable to Appellant. Ms. Davis testified that Zachary Davis started the fight when he punched Appellant. (RR IV – 33). Zachary threw the first punch because it appeared that Appellant was about to assault Rene. (RR IV – 33). Rene's specific testimony was "I know he punched him first because he was acting like he [Appellant] was going to come do something to me." (RR VI – 33). Joyce Akers' account of events was that Appellant had actually turned on Rene, grabbing her by the throat and pushing her against the wall. (RR III – 36-37). According to Rene Davis' account, the version most favorable to the defense, it is clear that Appellant was in the process of assaulting Rene when Zachary struck him. Zachary's action was taken to defend Rene from Appellant. Zachary's use of force against Appellant was thus justified and lawful. There was no evidence that Appellant's retaliatory use of deadly force against Zachary Davis was lawful or a legitimate act of self-defense.

Appellant second point of error is without merit and should be denied.

**Prayer**

For the foregoing reasons, the State of Texas prays that this Honorable Court affirm the conviction and punishment of ALLAN LATOI

20

STORY for the offense of MURDER, and prays for such other and further relief as may be provided by law.

> Respectfully Submitted:
> **ABELINO 'ABEL' REYNA**
> Criminal District Attorney
> McLennan County, Texas
>
> /s/ Sterling Harmon
> **STERLING HARMON**
> Appellate Division Chief
> 219 North 6th Street, Suite 200
> Waco, Texas 76701
> [Tel.] (254) 757-5084
> [Fax] (254) 757-5021
> [Email]
> sterling.harmon@
> co.mclennan.tx.us
> State Bar No. 09019700

## Certificate of Compliance

This document complies with the typeface requirements of *Tex. R. App. P*. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of *Tex. R. App. P*. 9.4(i), if applicable, because it contains 4,912 words, excluding any parts exempted by *Tex. R. App. P*. 9.4(i)(1).

## Certificate of Service

I certify that I caused to be served a true and correct copy of this State's Brief by E-Filing Service on Appellant's attorney of record, Doyle Young at dyounglaw.waco@gmail.com.


DATE: 6/11/15                    /S/ STERLING HARMON

                                 STERLING HARMON