**Opinion issued April 2, 2026**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-24-00305-CR

—————————————

**GODSON OLAYIWOLA AKRAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 18-DCR-083804**

---

## MEMORANDUM OPINION

A jury convicted Appellant Godson Olayiwola Akran of the first-degree felony offense of murder and assessed his punishment at forty-five years in the Texas Department of Criminal Justice. On appeal, Akran argues that the evidence

is legally insufficient to sustain his conviction because the evidence demonstrates he acted in self-defense.

We affirm.

## Background

In the early morning hours of August 16, 2018, Lola Briggs was at her home in Fort Bend County, Texas with her three children and their nanny. Taofeek Anifata ("Taofeek")—a man with whom Briggs was in a relationship—was also at Briggs' home and getting ready to leave.[1] At around 3 a.m., Akran rang Briggs' doorbell and banged on her door. Akran was separated from Briggs—the mother of his children—but they still maintained a physical relationship.

When Akran entered Briggs' home and saw Taofeek, he and Taofeek began to argue. Taofeek challenged Akran to a fight and the two men began fighting. Akran grabbed a kitchen knife and stabbed Taofeek with the knife. Paramedics later declared Taofeek deceased at the scene.

Akran was charged with the felony offense of murder. He pled not guilty, and the case proceeded to a jury trial. During trial, Akran argued he acted in self-defense after Taofeek threw a chair at him.

## Trial Proceedings

---

[1] The State explained in its opening argument that Taofeek was involved in a relationship with Briggs while married to someone else. Briggs was seeing both Taofeek and Akran when the stabbing occurred. Akran was cheating on his live-in girlfriend with Briggs.

2

After opening arguments, the jury listened to the two 911 calls—one made by Briggs and one made by Akran. Afterward, fifteen witnesses testified for the State. [2, 3]

**Lola Briggs**

Briggs testified that she was single and had three children. Akran is the father of her two youngest children. Akran saw the children and provided for them financially when he could. Because Briggs travels for work, she hired a live-in nanny to help with the children.

Briggs met Akran in 2012. The following year, she and Akran had a wedding ceremony, although they never obtained a marriage certificate. Her children with Akran were born in 2013 and 2016. Briggs and Akran separated in 2017. Although Briggs and Akran were both seeing other people, they were working toward reuniting.

Briggs met Taofeek in 2002 or 2003. She had a relationship with him before she met Akran. After Briggs and Akran separated in 2017, Briggs and Taofeek renewed their relationship. Briggs testified that Taofeek, who was still married to someone else, was her best friend and helping her financially. She testified that after their separation, she and Akran still had a physical relationship.

---

[2]   The defense did not present any witnesses.

[3]   We only summarize the witness testimony that is pertinent to the self-defense issue raised by Akran on appeal.

According to Briggs, by the time she got home from work on the evening of August 15, 2018, the children were in bed. After the children went to bed, Taofeek came over. At around 3 a.m. on August 16, she was getting ready for bed. Taofeek was in the kitchen, getting something to eat, and planned to leave after. They heard knocking and "beating" on the front door. She saw Akran at the door. He told her to open the door and let him in so he could charge his phone. Briggs handed Akran a charger and closed and locked the door. Akran then began to charge his phone using an outlet outside Briggs' house.

According to Briggs, she was surprised when Akran showed up at her house. She and Taofeek began to argue about Akran being there. Taofeek, who was upset about Akran's arrival, left. As Briggs walked toward her bedroom, the doorbell rang. It was Taofeek. She let him in and began to shut the door, but Akran came in behind him. Akran told Briggs he was going to get his kids. He went upstairs, woke them up, and brought them downstairs.[4] Briggs and the nanny told Akran to leave the children alone. According to Briggs, she asked Taofeek and Akran to leave repeatedly.

Briggs testified that Akran told the nanny he was not trying to cause any trouble, and that if he were a bad person, he would have done something to Taofeek's car, which was parked in front of the house. Taofeek told Akran that if

---

[4] The nanny and the eldest child also went downstairs.

he touched his car, he would go to jail. According to Briggs, that is "when the rage started." There were words "being thrown." Taofeek said derogatory things about Akran's mother.

Briggs told both men to leave. Akran and Taofeek were arguing and yelling at each other. Briggs called her mother on the phone "when [she] felt like it was getting out of hand and no one was listening" and put her on speaker. Briggs' mother scolded the men. They both calmed down and remained calm until Briggs' mother hung up. They then started arguing again and Taofeek was "basically telling [Akran] to come . . . if he wants to fight."

Briggs testified that Akran went to get a knife and then ran with the knife in his hand toward Taofeek. She testified that Taofeek grabbed a chair and threw it at Akran after he ran toward Taofeek with the knife. Briggs later testified that the chair was thrown first. Briggs then testified that she did not know "exactly when [Akran] got the knife." She testified that the men were throwing punches and then "all of the sudden . . . Taofeek [fell] to the floor." She testified the fight lasted not more than three minutes.

Akran "started trying to wake Taofeek up. [H]e was tapping him and he was, like, he's not dead. He's not dead." Then Akran "was trying to give Taofeek water." She and Akran each called 911.

After the police arrived, they took the children to Child Advocates of Fort Bend to be interviewed.

**Fayama Odoms**

Fayama Odoms was hired in 2018 as the children's live-in nanny. She left Briggs' employ four months after the stabbing and did not keep in touch with the family.

According to Odoms, on August 16, 2018, Briggs came home with Taofeek at around 7 or 8 p.m. Odoms went to bed at about 10 p.m. and was awoken by a ringing doorbell at around 4 a.m. She went back to sleep but then heard a bang. She heard Briggs asking Akran why he had come over without letting her know first. Odoms testified that Akran routinely visited his children and Briggs would let Odoms know ahead of time. Akran never showed up unannounced in the middle of the night. According to Odoms, Akran stated he wanted to leave with his children and Odoms told him not to. By this time, Odoms was downstairs with Briggs, Taofeek, and Akran.

Odoms testified that Taofeek and Akran began to argue and yell at each other, and Taofeek challenged Briggs to a fight. Akran opened a kitchen drawer, took out a knife, and ran to Taofeek, who was sitting at the breakfast table. According to Odoms, Taofeek stood when he saw Akran running toward him. When he saw Akran running toward him, Taofeek "took up the chair, say he want

6

to fight, to—then he slip down, fell on the floor." Odoms testified that Taofeek "took [the chair] up" "[a]s he was going to fight with it." According to Odoms, Taofeek did not throw the chair at Akran. When Taofeek fell to the floor, Akran stabbed him. Odoms testified that Taofeek did not hit Akran, run at Akran, or throw anything at Akran before Akran got the knife. Odoms asked Akran why he killed Taofeek. According to Odoms, Akran replied, "I don't care. I'll go to jail." Akran then left.

**Ben[5]**

Ben, who is Briggs' eldest child, was nineteen when he testified. He was thirteen when the stabbing occurred and his siblings were two and four years old. At the time, he lived with his siblings, his mother, and the nanny. He testified that Akran was a stepdad of sorts to him and treated him well. According to Ben, after Briggs and Akran separated, it appeared they were still on friendly terms. Ben testified that he knew Taofeek before he met Akran and that Taofeek also treated him well.

According to Ben, on August 16, 2018, he was awoken in the middle of the night by an argument between Taofeek and Akran. The argument may have lasted about an hour. Ben testified that Briggs and the nanny asked Akran to leave. Akran

---

[5] We use pseudonyms to protect the identity of "any person who was a minor at the time the offense was committed." TEX. R. APP. P. 9.10(a)(3), (b); *see Ingerson v. State*, 559 S.W.3d 501, 503 (Tex. Crim. App. 2018).

said he wanted to take his children and leave, but Briggs and the nanny objected. Ben testified that Taofeek asked Akran multiple times to fight but Taofeek, who was bigger than Akran, never hit Akran or charged at him or knocked him down.

Ben initially testified that Taofeek threw the chair before Akran grabbed the knife. But he later testified that Taofeek did not hit or throw anything at Akran before Akran went toward him with the knife and that Taofeek did not point a weapon at Akran before Akran approached him with the knife. According to Ben, after Taofeek fell, Akran continued to punch Taofeek. Akran then got some water to wake him up.

When Ben testified that he could not remember the details of the stabbing, he listened, outside the jury's presence, to a recorded statement he gave to Child Advocates on the day of the stabbing. Ben then testified that in his statement,[6] he stated that Akran got a knife out of a kitchen drawer and charged at Taofeek and punched toward Taofeek. Ben testified that in his statement, he stated that after Akran charged Taofeek, Taofeek grabbed a chair and threw it toward Akran but missed. After Taofeek fell, Akran continued to punch him.

Ben testified that according to his statement, Akran got the knife out of a kitchen drawer while Taofeek was in the breakfast area. Akran swung at Taofeek but missed. Taofeek threw the chair, but it did not hit Akran. They were fighting,

_____

[6]     Although Ben's statement was not played for the jury, after he listened to it outside the jury's presence, he was asked about the statement.

"like normal punches." The knife was in Akran's hand at the time. Then Taofeek fell, and Akran was on the ground, still swinging at Taofeek.

Ben testified that after the stabbing, Akran used Ben's phone to call 911. After calling 911, Akran went outside and walked away. Ben told the police that the knife used in the stabbing was in the kitchen drawer.

**Samara Merrick**

Samara Merrick dated Akran from 2017 through 2022. She testified that Akran went out with his friends on August 15, 2018, and early on August 16, he called her to pick him up at Briggs' house. She found it strange that Akran was at Briggs' house because it was not a normal hour for him to be visiting his children. On the way to pick him up, Merrick called Akran and asked what was going on. He responded "that he th[ought] he killed someone." He sounded "nervous" and told her he called 911. He was panicking. According to Merrick, once she picked him up, Akran told her he thought he killed someone after finding him in bed with his "baby mama."

**Donald Hess**

On the way to Briggs' house in response to a possible stabbing, Officer Donald Hess, a Fulshear police officer, became suspicious of Merrick's speeding car and he began to pursue it. After chasing the car for a half mile to a mile, Merrick pulled over. According to Officer Hess, the passenger appeared to be

"either intoxicated or under some type of influence of something." He testified that the driver was cooperative. The passenger was evasive at first, then cooperative. Police handcuffed the driver and the passenger of the car.[7]

**Detective David Williams**

Detective David Williams of the Fort Bend County Sheriff's Office testified that he was sent to Briggs' house on August 16, 2018. He arrived and learned Taofeek had been pronounced dead. He located the knife used in the stabbing in a kitchen drawer when one of the children told him where to find it. The blade, which was broken off, was recovered during Taofeek's autopsy.

Detective Williams obtained statements from Briggs, Odoms, Ben, Merrick, and Akran. He also searched two cell phones recovered at the scene. One belonged to Briggs and the other to Ben. He also spoke with Merrick, who was cooperative and not believed to have been involved with the crime. He spoke with Akran, who had blood on his face, shirt, and pants. Akran did not appear to be injured.

Akran's audio statement to Detective Williams was played for the jury.[8] According to Detective Williams, Akran did not say during his statement that Taofeek hit him or had a weapon. Akran said he had a knife in his hand because Taofeek kept talking to him and made him angry. During the statement, Akran said

---

[7]    Merrick was not taken into custody.

[8]    The audio statement in the record was of poor quality and could not be understood in its entirety.

he had a weapon in his hand before any mention of a chair, and he made it clear that no force was used against him before he got the knife.

Detective Williams observed the forensic interviews of the children, and he found nothing that led him to believe that Taofeek was the first aggressor. On the contrary, Detective Williams testified that he believed Akran was the first aggressor.

**Sergeant Justin White**

Sergeant Justin White, an officer with the Fort Bend County Sheriff's Office, assisted Detective Williams with the investigation of Taofeek's death. He was sent to the scene where Merrick's car was stopped so that he could interview Akran.

Sergeant White did not observe any injuries on Akran. Akran did not mention any injuries or request medical attention. Akran waived his *Miranda* warnings and spoke to the police while he was in the car. Sergeant White listened to Akran's statement to Detective Williams. According to Sergeant White, Akran did not express fear for his life during the altercation, and he did not say he had been hurt or attacked.

Sergeant White testified that Akran told police he was arguing with Taofeek at Briggs' house and Taofeek wanted to fight him. Akran said he had a weapon in his hand because Taofeek made him angry. Akran said Taofeek had a chair in his

11

hand. According to Sergeant White, Akran said the chair "may have been thrown in his direction." The discussion of the chair in the interview was "very brief." Akran stated "he had the knife in his hand before the decedent grabbed the chair." Sergeant White testified that Akran said he "was in possession of the knife first. And then the—[] interaction with the chair happened after that."

**Dr. Erin Barnhart**

Dr. Erin Barnhart is Galveston County's chief medical examiner.[9] She testified that Taofeek had two stab wounds, one in the right chest and one in his abdomen. The first wound was to the right chest and the second to the abdomen. A knife blade was found in the abdomen wound. She testified that the wound to the chest was a fatal wound that would have killed Taofeek "fairly quickly," but he could have survived for a minute or two. Dr. Barnhart testified that it could have been possible for Taofeek to throw a chair immediately after he was stabbed in the chest. He could have moved backward or forward immediately after being stabbed, and he could have continued a fist fight for a minute after the stabbing.

---

[9] At the time of Taofeek's death, Fort Bend County did not have its own medical examiner's office and contracted with Galveston County to provide forensic autopsies. A Galveston County forensic pathologist conducted Taofeek's autopsy.

**The Verdict**

The jury convicted Akran and assessed his punishment at forty-five years. This appeal ensued. Appellant argues that the evidence is insufficient because the evidence demonstrates he was justified in using deadly force against Taofeek.

**A.      Standard of Review**

A defendant has the burden of producing some evidence to support a claim of self-defense. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."); *see also London v. State*, 325 S.W.3d 197, 202 (Tex. App.—Dallas 2008, pet. ref'd) ("A defendant has the burden of producing some evidence to support a claim of self-defense."). The State bears the burden of persuasion to negate self-defense. *See Braughton*, 569 S.W.3d at 608; *London*, 325 S.W.3d at 202. But the State's burden "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 608 (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). A jury's guilty verdict is an implicit finding rejecting a defendant's self-defense theory. *London*, 325 S.W.3d at 202 (citing *Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim. App. 1991)).

We review both legal and factual sufficiency challenges to the jury's rejection of self-defense under the *Jackson v. Virginia* standard. *See Rankin v. State*, 617 S.W.3d 169, 182 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Rankin*, 617 S.W.3d at 182. Viewed in the light most favorable to the verdict, the evidence is insufficient under this standard when either (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *Rankin*, 617 S.W.3d at 182 (citing *Jackson*, 443 U.S. at 314, 319 n.11).

An appellate court "may not re-evaluate the weight and credibility of the record evidence and thereby substitute [its] judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*; *see Rankin*, 617 S.W.3d at 182 (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *see also Hooper*, 214 S.W.3d at 15 (stating juries may draw multiple reasonable inferences from direct or circumstantial so long as each inference is supported by

14

evidence). Because self-defense is a fact issue to be determined by the jury, the jury may accept or reject any defensive evidence on the issue. *Mitchell v. State*, 590 S.W.3d 597, 604 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citing *Saxton*, 804 S.W.2d at 913–14). Where "there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Braughton*, 569 S.W.3d at 608 (quoting *Evans v. State,* 202 S.W.3d 158, 163 (Tex. Crim. App. 2006)). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Rankin*, 617 S.W.3d at 182.

## B.    Applicable Law

One commits murder if he

(1) intentionally or knowingly causes the death of an individual; or

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual[.]

TEX. PEN. CODE § 19.02(b)(1)-(2).[10] A jury may infer that the defendant intended to kill the complainant from the defendant's use of a deadly weapon and from other circumstantial evidence, including the defendant's acts, words, and the extent

---

[10]    The jury charge included this definition. The charge also instructed that one "acts intentionally, or with intent, when it is his conscious objective or desire to cause the result." Further, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." Finally, the charge instructed that one is criminally responsible "if the result would not have occurred but for his conduct."

of the complainant's injuries. *See Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (stating jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon"); *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (stating defendant's "intent to commit murder may [] be inferred from circumstantial evidence, including his acts and words"); *Lopez v. State*, 672 S.W.3d 915, 923 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd) ("Intent to kill may [] be inferred from the nature and extent of the injuries inflicted on the victim.").

The use of deadly force in self-defense is a defense to prosecution for murder if the use of deadly force is "justified." TEX. PENAL CODE §§ 9.02, 9.31–.32. Section 9.31(a) of the Penal Code states that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Section 9.32(a) of the Penal Code provides that a person's use of deadly force is justified "if the actor would be justified in using force against the other under Section 9.31" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force[.]" *Id.* § 9.32(a)(1)–(2)(A).

The phrase "reasonably believes" contains "subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). "A defendant must subjectively believe that another person used or attempted to use unlawful force . . . or deadly force . . . against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* The defendant's subjective belief, however, must be objectively reasonable. *Id.* The reasonableness of the defendant's subjective belief is measured by the objective standard of an "ordinary and prudent man." *Id.* (quoting TEX. PENAL CODE § 1.07(a)(42)); *see* TEX. PENAL CODE § 1.07(a)(42) (defining "reasonable belief" as one held by "an ordinary and prudent man in the same circumstances as the actor").

A defendant need not testify to raise the issue of self-defense. *See VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.) ("Defensive issues may be raised by the testimony of any witnesses, even those called by the State."); *see also Lavern v. State*, 48 S.W.3d 356, 360 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("While a non-testifying defendant may be entitled to a charge on self-defense, it is rare for the defense to be raised when the defendant fails to testify."). However, there must be some evidence of the defendant's subjective belief that another person used or attempted to use unlawful or deadly force against the defendant "and that the defendant's use of unlawful or

17

deadly force in response was immediately necessary." *See Lozano*, 636 S.W.3d at 32.

When, as here, a defendant does not testify, the record must contain evidence of "observable manifestations" of the defendant's state of mind at the time of the alleged act of self-defense, or some evidence from which the jury can infer the defendant had the requisite *mens rea. See VanBrackle*, 179 S.W.3d at 714; *see also Lozano*, 636 S.W.3d at 33 ("[A] person's belief, absent direct evidence, generally must be inferred from the circumstances of the case."). Observable manifestations of a defendant's state of mind include evidence that the defendant called for help during an altercation or told the complainant, "I don't want to fight you . . . . leave me alone," as they struggled. *Arevalo v. State*, No. 01-19-00085-CR, 2020 WL 3968671, at *3 (Tex. App.—Houston [1st Dist.] Mar. 24, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *VanBrackle*, 179 S.W.3d at 714).

## C.    Analysis

Viewed in the light most favorable to the verdict, the record reflects that Akran appeared at Briggs' home in the early morning hours of August 16, 2018, and upon learning Taofeek was in the house, stated he was going to get his children and leave. Odoms and Briggs attempted to dissuade Akran from leaving with the children in the middle of the night.

Akran told Odoms that he was not a bad person, and that if he were one, he would have damaged Taofeek's car, which was parked in front of the house. At that point, Akran and Taofeek began to argue in Briggs' home. The men calmed down at some point but soon thereafter, the argument escalated again. At some point during the argument, the men went into the breakfast area of Briggs' house. Akran ran toward Taofeek with a knife and Taofeek threw a chair at Akran. Akran stabbed Taofeek twice and he died within a few minutes.

The record reflects there was conflicting testimony as to whether Akran ran toward Taofeek with the knife before or after Taofeek grabbed or threw a chair at him. Briggs testified both that Taofeek threw a chair at Akran after he ran toward Taofeek with the knife and also that Taofeek threw the chair first. Ben testified at trial that Taofeek threw the chair before Akran grabbed the knife, but later he testified that Taofeek did not point any weapon at Akran or throw the chair before Akran approached him with the knife. Ben also conceded during trial that he gave a statement the day of the stabbing where he said that Akran charged Taofeek, swinging at Taofeek with the knife in his hand, before Taofeek threw the chair at Akran. As the sole fact finder, it was the jury's province to resolve any conflicts in the evidence, and we defer to the jury's resolution of the issue. *See Rankin*, 617 S.W.3d at 182 (stating courts defer to jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

19

ultimate facts"). The jury could have believed testimony that Akran charged at Taofeek with a knife before Taofeek threw the chair and disbelieved any testimony that Taofeek threw the chair at Akran first.

There is also no evidence that Akran subjectively believed that the use of deadly force was immediately necessary to protect himself from Taofeek. There is no evidence that Akran made any statements before, during, or after the stabbing indicating he believed Taofeek was using or attempting to use unlawful force or unlawful deadly force against him and that his use of deadly force in response was immediately necessary. On the contrary, during Detective Williams' interview of Akran soon after the stabbing, Akran did not say Taofeek that hit him or had a weapon. When asked why he had a knife in his hand, Akran said it was because Taofeek kept talking to him and made him angry. Akran told police that no force was used against him before he got the knife from the kitchen drawer. *See VanBrackle*, 179 S.W.3d at 714 (concluding evidence defendant "responded to this assault by grabbing the pistol, pushing it away, and calling for help" was observable manifestation of defendant's state of mind); *Arevalo*, 2020 WL 3968671, at *3 (concluding evidence showing that defendant told complainant, "I don't want to fight you . . . . leave me alone," as they struggled was observable

20

manifestation of defendant's state of mind).[11] Assuming the evidence could support a finding that a person in Akran's position could have reasonably believed the use of deadly force was immediately necessary, there is no evidence that Akran held this subjective belief. *See Lozano*, 636 S.W.3d at 32 (stating defendant's subjective belief that use of deadly force is immediately necessary must be objectively reasonable when measured by objective standard of ordinary and prudent man).

Akran argues that testimony by Briggs, Dr. Barnhart, and Detective Williams supports his self-defense claim. He points to testimony by Briggs regarding Taofeek's challenge of Akran to a fight, and her conflicting testimony that Akran picked up a knife to defend himself against Taofeek after Taofeek threw a chair at Akran. He also relies on Detective Williams' testimony that one who is defending himself does not have to wait to get hit and that a chair can cause serious bodily injury, and on testimony by Dr. Barnhart that it is possible Taofeek continued to struggle with Akran right before his death. But challenging someone to a fight is not tantamount to the use of deadly or unlawful force, and as noted, Briggs also testified that the chair was not thrown before Akran got a knife from

---

[11] According to the audio of Akran's 911 call after the stabbing, Akran calmly told the 911 operator that Taofeek had fainted and needed medical attention. He subsequently became agitated and told the 911 operator that Akran was bleeding and to "hurry up." He told the operator an ambulance was needed but not the police.

the kitchen drawer. While Akran points to testimony from Dr. Barnhart and Detective Williams, neither of them addressed Akran's state of mind when he stabbed Taofeek. Detective Williams testified that he did not find anything that led him to believe Taofeek was the first aggressor.

Akran also ignores testimony that indicates he ran with a knife toward Taofeek before the chair was thrown. In addition to Briggs' testimony, Ben's statement, made the day of the stabbing, indicated that Taofeek threw the chair after Akran ran toward him with a knife. And according to Detective Williams, Akran's statement to police indicated he got a knife because Taofeek kept talking to him and made him angry, and that no force was used against him before he got the knife.

In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). For example, "[i]t is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005)

22

(internal citations omitted); *see Brown*, 122 S.W.3d at 800 (stating intent to kill can be inferred from defendant's "use of a deadly weapon").

Based on the record before us, and viewing the evidence in the light most favorable to the verdict, as we must, we conclude that a jury rationally could have found beyond a reasonable doubt that Akran intentionally caused Taofeek's death by stabbing him and that Akran did not reasonably believe that deadly force was immediately necessary to protect himself from Taofeek, thus rejecting Akran's self-defense claim. *See Rankin*, 617 S.W.3d at 184.

We hold there was sufficient evidence supporting the jury's rejection of Akran's self-defense claim. We overrule Akran's sole issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

Do not publish. TEX. R. APP. P. 47.2(b).

23